CATHERINE S. PIKE, REVIVED IN THE NAME OF A. R. JOHNSON, EXECUTOR OF THE ESTATE OF CATHERINE S. PIKE, DECEASED, ET AL., APPELLANTS, v. CLARENCE A. TRISKA ET AL., APPELLEES.

84 N. W. 2d 311

Filed July 12, 1957. No. 34092.

*W. I. Tillinghast, Halligan & Mullikin,* and *George B. Hastings,* for appellants.

*Baskins & Baskins* and *McGinley, Lane, Powers & McGinley,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

On September 18, 1952, Catherine S. Pike originally brought this action as plaintiff against defendants, Clarence A. Triska, Emily J. Triska, his wife, and LeRoy A. DeVoe, seeking to set aside and cancel a contract and warranty deed allegedly procured on July 28, 1950, by mistake, fraud and misrepresentation of defendant, Clarence A. Triska. Plaintiff also sought to compel said defendant to give an accounting of rents, profits received, and expenses incurred and paid by him after allowance of proper consideration for his services performed while purportedly acting as plaintiff's agent. Further, plaintiff sought to have said defendant restrained and enjoined from molesting plaintiff and the tenants on plaintiff's farms, from going upon any of her lands, and from disposing of any money belonging to plaintiff. LeRoy A. DeVoe was joined as a defendant solely in order that the court could have jurisdiction over him because he had possession of the warranty deed. There was no allegation or contention that such defendant was guilty of any undue influence, fraud, or misrepresentations in the preparation, execution, and delivery of the contract and warranty deed. A copy of such contract, marked exhibit A, was attached to and made a part of plaintiff's petition.

A restraining order as prayed was granted ex parte, but after a hearing same was dissolved insofar as it prevented defendant, Clarence A. Triska, from going upon certain real property involved. Also, an application by plaintiff for appointment of a receiver was heard and denied.

The separate answer of defendants Triska denied generally and alleged substantially that the contract and deed were made, executed, and delivered by plaintiff as consideration for defendant Clarence A. Triska's serv-

ices and his agreement to manage plaintiff's property and financial affairs as he would his own, and take care of all her personal needs and comforts so long as she lived. A copy of a power of attorney, concededly executed and delivered to defendant on December 27, 1949, by plaintiff and her husband, Charles D. Pike, during his lifetime, together with a copy of the contract and warranty deed allegedly executed and delivered by plaintiff on July 28, 1950, were respectively marked exhibits A, B, and C, and attached to and made a part of defendant's answer. Defendants prayed for dismissal and authority to continue performance of the contract with plaintiff, or in the alternative that defendant Clarence A. Triska should have judgment against plaintiff for his own funds advanced to her and the reasonable value of his services and unpaid expenses. Insofar as important here, plaintiff's reply thereto was a general denial.

On March 2, 1954, plaintiff Catherine S. Pike died, and the action was revived by stipulation in the names of A. R. Johnson, executor of her estate, and named beneficiaries in her last will, executed January 14, 1953, who stood in plaintiff's shoes and took her rights, if any, by succession. Those latter persons included Anna Sexton, plaintiff's practical nurse and housekeeper, and Augustine Galavez, a tenant on one of plaintiff's farms. After plaintiff's death, defendants Triska filed a supplemental answer, alleging plaintiff's death and that, as provided in the contract, exhibit B attached to and made a part of their original answer, defendant Clarence A. Triska was entitled to delivery of the warranty deed to him by defendant LeRoy A. DeVoe. They renewed the prayer of their original answer and prayed in addition that the real property described in the contract and warranty deed be declared to belong to defendant Clarence A. Triska, and that defendant LeRoy A. DeVoe should be required to deliver said warranty

deed to said defendant. Insofar as important here, plaintiffs' reply thereto was a general denial.

In the meantime, on March 3, 1953, after a pre-trial hearing, the trial court entered its pre-trial order, which by agreement fixed the issues actually tried. Therein the issues tendered by plaintiff were substantially as follows: (1) That the signature of plaintiff to exhibit A, the contract of July 28, 1950, was procured by fraud or mistake; (2) that the execution of exhibit A was induced by fraudulent misrepresentation; (3) that defendant Clarence A. Triska had violated the trust or duty owing by him to plaintiff; (4) that plaintiff had the power to terminate exhibit A by the notice given in her petition; and (5) that said defendant had a duty to account to plaintiff irrespective of the validity of exhibit A, and if so, he was subject to a personal liability to pay plaintiff any balance found to be due her.

The issues tendered by defendants were substantially as follows: (1) Denial of plaintiff's tendered issues numbered 1, 2, 3, and 4; (2) defendant Clarence A. Triska conceded that he had a general duty to render a report to plaintiff of his acts, doings, and financial transactions in her behalf, but denied any liability to pay over any general balance to plaintiff in excess of amounts required for her immediate personal needs as they develop from time to time; and (3) that if an adverse finding is made as to any one of plaintiff's issues numbered 1, 2, 3, or 4, then said defendant is entitled to reimbursement for any balance due him upon the accounting between the parties.

Defendant Clarence A. Triska agreed to give an accounting and did so. In doing so, he employed a firm of accountants who examined and reported in writing every item of money received, deposited, and expended by said defendant while handling plaintiff's property and financial affairs, which report, disclosing a balance due defendant of $11,844.57, was made available to plaintiff and her counsel. Such report appears in the

record during separate hearings respectively as exhibit 8 and exhibit M-1. Hearings upon several issues were had by the court on April 7, July 16, September 23 and 24, 1953, and on April 30, 1956. In the meantime, however, the trial court adjourned the hearing upon the merits and appointed a referee to hear testimony in proceedings for an accounting, and report his findings to the court. Such hearings took place on November 22, 23, and 30, and December 1 and 10, 1954. Thereafter, on May 9, 1955, the referee reported at length that he found a net balance due defendant Clarence A. Triska from plaintiff of $6,303.79. The voluminous evidence adduced at that hearing was received in evidence and made a part of the bill of exceptions now before us.

Subsequently, on May 1, 1956, the trial court rendered its decree, finding and adjudging the issues generally in favor of defendants and against plaintiffs, but taxing all costs to defendant Clarence A. Triska. In doing so, the court found and adjudged with relation to the contract and deed that their execution and delivery were not induced or procured by mistake, undue influence, fraud, or misrepresentation; that defendant had performed the contract and handled plaintiff's farm operations and financial affairs as he would his own, and provided for plaintiff's support and maintenance without regard to availability of funds from Pike resources in the manner agreed upon by the parties and ratified by plaintiff, until defendant was stopped from doing so by injunctive process; that without a breach of duty by defendant in failing to so support plaintiff or refusal to turn over funds that belonged to her, the contract and deed were irrevocable; that plaintiff was entitled to a full accounting by defendant; but no demand therefor had been made by her until this action was filed, which was then done, and no damages were shown by defendant's failure to previously do so, although it appeared that defendant's bookkeeping, accounting, and fiscal matters were irregularly handled in some respects.

The decree found and adjudged that execution and delivery of the contract and deed by plaintiff had the effect of vesting the real property therein described in defendant Clarence A. Triska as of July 28, 1950, subject to a life estate in plaintiff; that upon her death, March 1, 1954, said defendant became the fee title owner thereof and entitled to delivery of the deed thereto by LeRoy A. DeVoe; and that said defendant was entitled to all crops planted upon such lands after March 1, 1954. The judgment quieted title to such real property in defendant Clarence A. Triska, ordered a writ of assistance to issue placing him in possession thereof, and enjoined plaintiffs from asserting any right, title, interest, claim, or demand thereto.

After due consideration of exceptions to the report of the referee and hearing thereon, the judgment sustained the exceptions in part and denied them in part. It found and adjudged that the 1953 and 1954 wheat crops in storage were the property of plaintiff's estate, but the 1955 wheat crop on described land belonged to defendant Clarence A. Triska, and that there was due said defendant from plaintiff the sum of $7,175.79. However, the court rendered no judgment therefor, since same was part of the consideration to be paid by said defendant in services and money for plaintiff's support and maintenance. The judgment also required the executor of plaintiff's estate to account to said defendant for the 1954 and 1955 crops upon certain described irrigated land, subject to appropriate offsets, credits, and charges for support, maintenance, expenses of last illness, and burial of plaintiff.

Thereafter, plaintiffs' motion for new trial was overruled and they appealed, assigning some 25 alleged errors, the effect of which was to allege that the judgment of the trial court was not sustained by the evidence but was contrary thereto and contrary to law. We conclude that plaintiffs' assignments should not be sustained, except with regard to one matter of law here-

inafter discussed which does not affect the result. Defendant Clarence A. Triska cross-appealed from that portion of the trial court's decree relating to the accounting, but concededly our affirmance of the judgment requires no decision upon the cross-appeal.

Hereinafter, for clarity and brevity, we will call Catherine S. Pike plaintiff. Her husband, Charles D. Pike, will be called Mr. Pike, but in speaking of both they will be called the Pikes. Defendant Clarence A. Triska will be called defendant, and his wife defendant Emily J. Triska will be called Emily, but in speaking of both they will be called defendants or the Triskas. Defendant LeRoy A. DeVoe will be called Mr. DeVoe.

"Actions in equity, on appeal to this court, are triable de novo, subject, however, to the rule that when credible evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Wiskocil v. Kliment, 155 Neb. 103, 50 N. W. 2d 786.

In the light of such rule, and other authorities hereinafter cited and discussed, we have examined the record which fairly discloses the following: For many years defendants were close personal friends of plaintiff and Mr. Pike, who had no close relatives. Defendant Emily first met Mrs. Pike in 1919 when she came to Ogallala. Emily was then 15 or 16 years old, and they became acquainted at social affairs. Emily's parents lived in the country, and she lived in the home of the Pikes 4 years while attending school in Ogallala. Thus their friendship became so close and affectionate that they treated each other as parents and daughter. The Pikes even insisted that defendant obtain their consent to marry Emily. Defendant first met the Pikes about 1925 in their home when he came to court Emily. He thereafter became a close personal friend of the Pikes.

Defendants were married May 27, 1927, and moved away from Ogallala, but thereafter came often to visit with the Pikes. There they always affectionately greeted and treated each other as if there was a parental relationship. In 1945 plaintiff had a serious operation, whereupon Emily came and spent more than a week taking plaintiff back and forth to a hospital in Sutherland. She was also with plaintiff when she was operated upon.

Mr. Pike was a contractor, and during the summers of 1928 and 1929 defendant did construction work for him. Thereafter, beginning in 1931 or 1932, defendant, as requested, made out Mr. Pike's income tax returns and took care of his tax matters. He continued to do that until Mr. Pike's death on January 11, 1950.

Plaintiff had arthritis for years, and a short time after her operation she fell and broke her hip from which she never recovered sufficiently to enable her to walk. Thus in 1949 she was bedfast most of the time, which required the supervision of a practical nurse to care for her, lift her about, and do the housekeeping. However, it appears conclusively that plaintiff had mental capacity at all times here involved, and no contention was made by plaintiffs that she did not. Mrs. Anna Sexton was one of those employed as a practical nurse and housekeeper by Mr. Pike in March 1949. As such she was paid $35 a week and board, and, except for 5 weeks in July and August 1950, when she had an injured arm and was unable to do that work, she continued to be so employed. She met defendants there the first night she worked.

Mr. Pike was not in good health, but was able to work some. He had a heart difficulty and in early September 1949 he became seriously ill. About December 8 or 10, 1949, he could sit up in a chair at times, but was generally kept under oxygen except for a few moments at meal times. In December 1949, Mrs. Sexton, at Mr. Pike's request, called defendant who lived in Sidney, and told him to come down to Pikes' home.

There Mr. Pike told defendant: " 'I am not in very good physical condition, I want you to look after my affairs, because I can't get out of the house.' "

Mr. DeVoe, a lawyer who had practiced in Ogallala for almost 47 years, had known the Pikes for 25 years. He had represented them as their lawyer in various matters for many years. He had drawn Mr. Pike's will and served as attorney for his estate after his death. He first met defendant about December 27, 1949, when, at the request of the Pikes, he prepared a power of attorney which was concededly duly signed, executed, acknowledged, and delivered to defendant by the Pikes in their home. Such instrument constituted and appointed defendant: "true and lawful attorney for us and in our name, place and stead.

"To collect and receipt for any money now due or that may hereafter become due us or either one of us;

"To lease land now owned by us or either of us and collect and receipt for rentals therefrom;

"To institute suits if necessary to collect rentals or to secure possession of property belonging to us or either of us;

"To endorse checks payable to us or either of us;

"To make income tax returns for us, pay the same, and to pay any and all taxes assessed against our property;

"To execute any and all papers necessary in connection with the operation of our affairs, giving and granting unto our said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and amount (about) the premises, as fully to all intents and purposes as we might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that our said attorney or his substitute shall lawfully do or cause to be done by virtue thereof."

Thereupon defendant, who was engaged in the oil

business at Sidney and operated his own wheat farm in Chase County, assumed the broad power and authority granted by the power of attorney and undertook by agreement the operation of all Pike property and financial affairs as if they were his own, with the understanding that for doing so defendant was to ultimately receive the real property here involved. However, Mr. Pike died on January 11, 1950, the very day that defendant brought his last income tax return to Mr. Pike's home and obtained his signature thereon. Defendants were both at the Pike home that day.

Mr. Pike's will had appointed plaintiff executrix of his estate, but she was physically unable to serve, so at her request and with her consent defendant was appointed administrator with the will annexed, whereupon he served as such without compensation until the estate was closed on May 23, 1951. In that connection, the real estate involved passed to plaintiff by operation of law under the provisions of joint tenancy by which the property had been held by plaintiff and Mr. Pike. However, with plaintiff's knowledge and consent, from the date of Mr. Pike's death until this action was filed, defendant looked after the care, support, and maintenance of plaintiff, her home, and farm operations, employed and paid all help, paid all expenses as Mr. Pike would have done, and in doing so, called at plaintiff's home and farms at least once a week and more often if the occasion required it. As a matter of fact, as hereafter observed, in order to do so, it became necessary for defendant to advance substantial sums of his own money, and he did so with the knowledge and consent of planitiff.

In that connection, on January 24, 1950, plaintiff requested her lawyer, Mr. DeVoe, to draw her will. He did so as instructed, and such will was concededly duly signed and executed as provided by law on that date. Therein, after making certain cash bequests unimportant here, the will provided: "Fourth: I give, bequeath and devise unto my friend Clarence A. Triska of Sidney, Ne-

braska, all of the rest and residue of my property, both real and personal or mixed, of whatever nature and wherever found, to be and become his absolutely, the real estate so devised shall descend to him and to his heirs and assigns forever in fee simple.

"Fifth: I hereby appoint the said Clarence A. Triska executor of this my last will and testament."

Theretofore defendant had suggested to plaintiff that she should make a will, but he had made no suggestion about its contents. As a matter of fact, Mr. DeVoe had then known defendant less than a month and defendant had no knowledge that the will had been drawn and executed nor the contents thereof until the trial of this case.

Between the date of Mr. Pike's death and July 1950, it was definitely discovered that income from plaintiff's farms would be insufficient to meet necessary expenses for the support and maintenance of plaintiff and the operation of her property and affairs, so plaintiff and defendant discussed the entire matter, whereat she told defendant "she would try and arrange the affairs in such way that" defendant "could look after her affairs and pay her bills, and be protected in any money that" he "would invest in the operation, and be protected so that" defendant "would receive the property after her death." In response thereto, plaintiff asked to have her attorney, Mr. DeVoe, come to her home, and defendant told him to do so.

On Sunday afternoon, which would be July 23, 1950, plaintiff told Mrs. Kuntz, her then practical nurse and housekeeper, that on Monday or Tuesday they would have company and Mrs. Kuntz should prepare a lunch for " 'Some men about some business * * * Mr. Triska and Mr. DeVoe.' * * * that they were to sign an agreement and contract and Mr. Triska was to take over the overseeing of all her business affairs because she was bedfast, and she knew that Mr. Pike wanted Mr. Triska to do that, and that was her will to do what Charley

wanted to do before she died." However, the arrival of defendant and Mr. DeVoe was unavoidably delayed until July 28, 1950. Upon their arrival, they discussed the entire matter with Mr. DeVoe who was then attorney for Mr. Pike's estate, and had been attorney for plaintiff and Mr. Pike for many years previously. In accord with plaintiff's instructions, Mr. DeVoe then went to his office where he prepared the contract and deed here involved, and returned with them about 3:30 p. m. Plaintiff then told Mr. DeVoe " 'she would like to have him read the papers to her.' " He did so, and plaintiff said "it was perfectly all right, that was the way she wanted it." Plaintiff sometimes read with a reading glass, so defendant held the glass so that plaintiff could plainly see to write her name on the line provided therefor, whereupon, in the presence of defendant, Mr. DeVoe, and Mrs. Kuntz, plaintiff and defendant signed, executed, acknowledged, and delivered the agreement, and plaintiff signed, executed, acknowledged, and delivered the deed to Mr. DeVoe.

Thereafter, plaintiff told Mr. DeVoe she "thought now that everything was all right, the way she wanted it, because that is the way Charlie wanted her to do things * * * Mr. Pike wanted Mr. Triska to have the property." Defendant and Mr. DeVoe then took the papers with them because plaintiff told Mr. Devoe, who had done their law business for many years, "to take the papers with him and take care of them with the rest of her papers" which "she had with" him. Nothing was said at the time about a will. After the contract and deed were executed and delivered, Emily stopped at plaintiff's home to greet her. There plaintiff happily said to Emily that "she could sleep that night, because she had fixed her business over so that Clarence could look after it and she knew that no one could come in and do away with her property, and she would be taken care of * * * she knew that was the way Charlie wanted it and that was the way she wanted it; * * *."

The contract first described plaintiff's real property, consisting of two farms and her home in Ogallala. It then said: "and whereas the said Clarence A. Triska as agent for said Catherine S. Pike is caring for all of said property, overseeing the farming operations on said land and the care of the live stock thereon,

"Now therefore in consideration of said services the said Catherine S. Pike desires that at the time of her death that the said land and property in Ogallala be conveyed to the said Clarence A. Triska and thereupon the same to be and become his absolutely.

"Whereupon the said Catherine S. Pike has on this date made and executed a warranty deed conveying all of said real estate to the said Clarence A. Triska, provided however *said deed shall be held in escrow by L. A. DeVoe for and during her natural life* and immediately after her death he is instructed to deliver said deed to the said Clarence A. Triska." (Italics supplied.)

The warranty deed to said land was duly signed, executed, acknowledged, and delivered to Mr. DeVoe as provided in the contract as a part of the same transaction. There is no dispute about its terms, which were absolute in form. It so remained thereafter in the possession of Mr. DeVoe without any attempt by plaintiff to exercise any dominion or control over it or any attempt on plaintiff's part to revoke it or to revoke the contract providing for delivery thereof to defendant, until this action was filed September 18, 1952.

Contrary to plaintiffs' contention, we conclude that the contract and warranty deed were not testamentary in character. They were contractual. Also, contrary to defendants' contention, and the finding by the trial court in its judgment, we conclude that the contract and deed did not vest legal title to the property therein described in defendant as of July 28, 1950, subject only to a life estate in plaintiff. However, as hereinafter observed, such latter conclusion does not change the result.

We conclude that such instruments simply reaffirmed

plaintiff's intention, previously expressed in her will of January 24, 1950, which was executed in conformity with the understanding when the power of attorney was executed on December 27, 1949, and assured defendant that if he performed the contract he would in any event receive title to the property by delivery of the deed to him by Mr. DeVoe immediately after plaintiff's death. In other words, plaintiff and defendant thereby perfected an escrow transaction. See, 30 C. J. S., Escrows, § 4, p. 1194; 19 Am. Jur., Escrow, § 3, p. 419.

In McDaniel v. McDaniel, 131 Neb. 639, 269 N. W. 380, this court stated the applicable and controlling principle by saying: "The transaction involved in the present case may be properly regarded as an escrow, which is properly defined as 'a written instrument, which by its terms imports a legal obligation, deposited by the grantor, promisor, or obligor, or his agent with a stranger or third person, * * * to be kept by the depositary until the performance of a condition or the happening of a certain event and then to be delivered over to take effect.' 21 C. J. 865.

" 'Until the performance of the condition the legal title to the land to be conveyed remains in the grantor.' 21 C. J. 882. See, also, Patrick v. McCormick, 10 Neb. 1, 4 N. W. 312; County of Calhoun v. American Emigrant Co., 93 U. S. 124, 23 L. Ed. 826; Muirhead v. McCullough, 234 Mich. 52, 207 N. W. 886.

"The form of the transaction implies the power of termination by the promisee in the event of failure to reasonably perform the controlling conditions required.

"In Crane Falls Power & Irrigation Co. v. Snake River Irrigation Co., 24 Idaho, 63, 133 Pac. 655, it was held that, although a grantor cannot withdraw the instrument deposited as escrow when the grantee has complied with his part of the escrow agreement, he may do so upon actual failure of the grantee to perform. See, also, Restatement, Contracts, sec. 103, subsection (2)."

Also, in Valentine Oil Co. v. Powers, 157 Neb. 71, 59 N. W. 2d 150, we concluded that the grantor or obligor of an instrument held in escrow loses control over it although he retains legal title and its concomitants until performance of the conditions of the escrow contract by the grantee or obligee. The grantor or obligor is not entitled to its return or revocation unless the grantee or obligee fails to fully perform the conditions of the escrow contract, and upon performance of such conditions the grantee or obligee is entitled to delivery of the instrument, which will be enforced by a decree of the court. However, when the grantee or obligee is in default he cannot enforce a delivery of the instrument to him by the depositary.

By analogy, of course, plaintiff herein retained legal title to the real property described in the contract and deed, but lost control over them so long as defendant performed the conditions of their contract and understanding, and upon full performance thereof by defendant during plaintiff's lifetime, as held by the trial court and affirmed herein, then on March 2, 1954, the date of plaintiff's death, the fee title to the property described in the deed vested in defendant, who became entitled to delivery of the instrument to him by Mr. DeVoe.

In Eggert v. Schroeder, 158 Neb. 65, 62 N. W. 2d 266, we held: "Courts should not set aside the disposition of property made by deed without good reasons, based upon clear and satisfactory proof.

"The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the will of the grantor."

In Little v. Curson, 114 Neb. 752, 209 N. W. 737, we held: "The evidence of the attorney who prepared the deed, of the notary who took the acknowledgment, and of the witnesses to the execution of the deed, alleged to have been obtained by undue influence exerted by the grantee, that the deed was executed by the grantor un-

derstandingly and voluntarily, cannot ordinarily be overcome by evidence relating to different occasions."

Plaintiff's testimony that if she executed the contract and deed they were procured by mistake, undue influence, fraud, and misrepresentations, and that she never did intend to give defendant any of her property, was self-contradictory, inconsistent, incredible, profane, and uncorroborated by any competent evidence. The evidence is overwhelming that there was no mistake, undue influence, fraud, or misrepresentation, and that plaintiff intended to and did execute and deliver the contract and deed on July 28, 1950, but subsequently, as hereinafter observed, changed her mind as a result of influences not caused or exercised by defendants.

In that connection also, plaintiffs' contention that the contract was unilateral, that it required defendant to do nothing, and was without consideration, has no merit. It is elementary that consideration for a contract may be a benefit to the promisor or a detriment to the promisee. Here we have both. Also, as recently reaffirmed in Leach v. Treber, 164 Neb. 419, 82 N. W. 2d 544: "In order for a detriment to the promisee to constitute a valid consideration for a note or contract, it must have been within the express or implied contemplation of the parties and known to and agreed to by them.           •

"Mutuality of obligation of both parties to a contract is not essential to effectuate a binding agreement where there is a separate valid consideration as an inducement to the agreement.

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Plaintiffs' contention is controlled thereby.

The execution and delivery of the contract and deed was one transaction. As held in Thompson v. Jost, 108 Neb. 778, 189 N. W. 169, and reaffirmed in Farmers

Union Cooperative Elevator Federation v. Carter, 152 Neb. 266, 40 N. W. 2d 870: "The general rule is that, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance."

Also, as held in Jensen v. Romigh, 133 Neb. 71, 274 N. W. 199, and reaffirmed in Dakota County v. Central Bridge & Construction Co., 136 Neb. 118, 285 N. W. 309: "The practical interpretation given a contract by the parties to it while they are engaged in its performance, and before any controversy has arisen concerning it, is one of the best indications of its true intent, and the courts will ordinarily enforce such construction."

After the contract and deed had been executed and delivered, defendant continued to conduct all of plaintiff's financial affairs as if they were his own, and has always been ready, willing, and able to continue to do so. He hired and paid practical nurses to care for plaintiff and do her housekeeping. He employed a physician for her and paid his fees which, without proof, plaintiff claimed were excessive. He paid for the food consumed by plaintiff and her practical nurses, and for the maintenance of her home. He gave plaintiff money for personal incidental expenses. He employed and paid the salary of plaintiff's tenant and other laborers on her farms. He improved the fences thereon and the pump irrigation system on one farm where irrigation was used, and paid for such improvements. He supervised the farm operations, purchased seed, rotated crops, repaired and purchased machinery for use thereon, and paid for same. He purchased gas, oil, and grease for the operation of tractors, a truck, and machinery used thereon, and paid for same. He collected and spent the income from crops and livestock on the farms and paid

all taxes on plaintiff's property. Some checks for crops were made payable to both defendant and plaintiff, and she endorsed them. The crops were seriously damaged by hail in 1950 and less seriously in 1951. The income from plaintiff's farms was not sufficient to pay all such expenses, so at numerous times defendant advanced sizeable sums of his own money and paid them. A. R. Johnson, the party selected by plaintiff to take care of her property and financial affairs after defendant had been enjoined from doing so, and who also acted as executor of her estate after her death, found that to be true while he looked after such operations. Also, plaintiff was well aware of that fact. Defendant talked with her about the situation at times, and she endorsed and turned over some $4,500 in government bonds to help meet sizeable deficits. Further, defendant drove his own car from Sidney to plaintiff's home in Ogallala, and from there out to supervise her farms and pay the help and other expenses each Friday or Tuesday and sometimes more often, without receiving any money as expenses or compensation for so doing. True, he made no written itemized report to plaintiff until this action was filed, but none was ever theretofore required by plaintiff, who often talked with defendant about the farming operations and the condition of her financial affairs.

After this action was filed, defendant voluntarily produced all of his books and records and had an accounting firm make a complete audit and report of every item of income and expense in the estate and farm accounts from January 11, 1950, to September 19, 1952. In the light thereof, and other evidence adduced, a report was filed on May 9, 1955, by the referee in the accounting proceedings. Such report found that there was a gross balance due defendant from plaintiff of $10,888.10; that after deducting therefrom six debit items, there was a balance due defendant from plaintiff of $8,785.72. Therefrom the referee deducted $4,934.33 as a charge for

feeding plaintiff's alfalfa and beet tops to certain cattle belonging to defendant, which left a balance of $3,851.39 due defendant from plaintiff. Thereto the referee added $2,452.40 as the value of defendant's services and car mileage expenses, and reported that plaintiff was indebted to defendant for a net amount of $6,303.79. After due consideration of plaintiffs' and defendants' exceptions to the referee's report, the trial court's decree concluded that there was due defendant from plaintiff $7,175.79 in excess of money received by defendant. No part thereof has ever been tendered or paid by plaintiffs.

The principal factual issue involved in this case was whether or not the contract and deed of July 28, 1950, were procured by mistake, fraud, and misrepresentation. The accounting upon which the referee's report is based arose out of alleged nonperformance of the contract by defendant. In that connection, plaintiff contended that a fiduciary relationship existed between plaintiff and defendant which, having been shown, raised a presumption of fraud. In disposing of that contention, we may assume that a fidicuary relationship existed between plaintiff and defendant. As a matter of fact, defendant admits it.

In Johnston v. Johnston, 155 Neb. 222, 51 N. W. 2d 332, this court said: "The rule also is: ' " Where it is sought to set aside a written instrument, and more especially one which has been executed with the formality of being signed in the presence of witnesses and acknowledged before a notary public, on account of fraud, the presumptions of validity and regularity attaching to such a document require clear and convincing evidence to preponderate against them. The formal instrument furnishes proof of the most cogent and solemn character, and to outweigh this proof requires a greater quantum of evidence than in a case where there are no such presumptions to overcome. * * *"' ' Neihart v. Ingraham, 140 Neb. 818, 2 N. W. 2d 28.

"While adhering to this rule, we feel that in the interest of exactness and in accord with the reasoning of our recent decisions, the last clause should be changed to read, 'and to outweigh this proof requires a higher quality of evidence than in a case where there are no such presumptions to overcome.' In re Estate of Baker, 144 Neb. 797, 14 N. W. 2d 585, 155 A. L. R. 950; Riley v. Riley, 150 Neb. 176, 33 N. W. 2d 525; In re Estate of Drake, 150 Neb. 568, 35 N. W. 2d 417.

"We reach the conclusion that plaintiff has not sustained his burden of proof and is not entitled to the relief prayed, and that the decree of the trial court should be affirmed as to the issues presented.

"In reaching this conclusion we are not unmindful of the relationship of trust and confidence between the parties here. The rule as to that is: 'In an action in which relief is sought on account of alleged fraud, the existence of a confidential or fiduciary relationship, or status of unequal footing, when shown, does not shift the position of the burden of proving all elements of the fraud alleged, but nevertheless may be sufficient to allow fraud to be found to have existed when in the absence of such a status it could not be so found, and thus to have the effect of placing the burden of going forward with the evidence upon the party charged with fraud.' Leichner v. First Trust Co., 133 Neb. 170, 274 N. W. 475. The answer is that a finding of fraud is not sustained by this record." See, also, Kucaba v. Kucaba, 146 Neb. 116, 18 N. W. 2d 645. That statement is controlling here.

With regard to the issue of performance, plaintiff contended that defendant, while acting as her agent in a fiduciary capacity, acted in bad faith, as follows: (1) By commingling his own money with that of plaintiff and the estate of Mr. Pike; (2) by placing his own cattle on plaintiff's farms and feeding them her alfalfa and beet tops without her knowledge or consent; and (3) by removing the tenant on one of her farms and

assuming possession and use thereof himself without her permission. In the light thereof, plaintiff argued that defendant could retain nothing acquired by him either in performance or violation of his agency, and plaintiff had a right to terminate the contract by notice given in her petition. We conclude otherwise.

With reference to plaintiff's first contention, it is conceded that defendant, as plaintiff's agent, commingled his own funds with those of plaintiff and Mr. Pike's estate, of which defendant was trustee. In that connection, however, Mr. Pike's estate was concededly closed on May 23, 1951, with a full accounting therefor by defendant, without even receiving any compensation for his services as administrator thereof with the will annexed.

The general rule is that: "The trustee is under a duty to the beneficiary to keep the trust property separate from his individual property, and, so far as it is reasonable that he should do so, to keep it separate from other property not subject to the trust and to see that the property is designated as property of the trust." Restatement, Trusts, § 179, p. 456. However, as stated in comment e, p. 460: "By the terms of the trust the trustee may be permitted to mingle trust property with his own property. It may be expressly so provided by the terms of the trust or the character of the trust may be such as to make this proper. In the case of a formal trust, such as a trust created by will or deed of trust, mingling by the trustee of trust property with his own property is improper, unless it is clearly permitted by the terms of the instrument. In the case of an informal trust such mingling is proper if such is the understanding of the parties as shown by their agreement or by custom. In such a case the trustee is not liable if he keeps on hand the amount of the trust property." See, also, Rotzin v. Miller, 134 Neb. 8, 277 N. W. 811, wherein we held: "When it affirmatively appears that a trustee took title to the trust property in his individual name

in good faith, and no loss resulted from his so doing, he is not liable for breach of trust. Restatement, Trusts, sec. 179, comment d."

On the other hand, as stated in Restatement, Agency, § 387, p. 867: "Subject to and in accordance with the . rules stated in §§ 388-398, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." As said in § 389, p. 873: "Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency." Also, as said in comment b, p. 873: "It may be understood at the time when the agent is appointed that he may deal on his own account." As said in comment d, p. 875: "Failure by the agent to reveal that he is acting on his own account or that he has a personal interest in the transaction is immaterial if the principal consents to this or has manifested his consent." Also, as said in § 398, p. 900: "Unless otherwise agreed, an agent receiving or holding things on behalf of the principal is subject to a duty to the principal not to receive or deal with them so that they will appear to be his own, and not so to mingle them with his own things as to destroy their identity."

In the case at bar, defendant was required by agreement and understanding to handle all plaintiff's financial and business affairs as he would his own, and he did so, with plaintiff's knowledge and consent, thereby expending his own funds far in excess of the income therefrom. True, it could be inferred by innuendo, which may be easily acclaimed without substantial foundation, that one check transaction and only one was not in good faith at its inception. However, that check was never ultimately charged to plaintiff by defendant, and even if it were, plaintiff was then indebted to him far more than the amount thereof, and she suffered no loss as the result of it.

Defendant did, in the fall of 1950, purchase several

cattle and placed them on plaintiff's farms, where they consumed some of her alfalfa and beet tops. However, that was done after full knowledge thereof by plaintiff and with her permission as a part of the farm operations. Plaintiff not only knew about it and gave her consent but also on two or three trips to her farms, which were provided for by defendant at his expense and at plaintiff's request so she could inspect the farming operations, plaintiff saw the cattle and was ultimately allowed $4,372.71 for their feed and care, which still left her indebted to defendant for $7,175.79.

With the knowledge and consent of plaintiff, a tenant on one of her farms was notified by defendant to vacate because he was paying only $50 a year for pasture rent, which was an insufficient amount. In that connection, plaintiff, by oral agreement, then rented the farm to defendant himself for one-third of the crop and $150 a year for the pasture rent, and the crop therefrom was accounted for to plaintiff.

On May 16, 1951, plaintiff executed another will which disposed of her real property in a manner different from that provided in her will executed on January 24, 1950, and contrary to the terms of her contract with defendant and the deed delivered thereunder. There is evidence from which it could reasonably be inferred that she was influenced to do so by Mrs. Sexton who had been plaintiff's practical nurse and housekeeper since March 1949 and wanted to obtain plaintiff's home and the contents thereof as consideration for staying with plaintiff during her lifetime. In doing so, plaintiff did not call Mr. DeVoe who had previously been her attorney, or inform defendant of her acts or intention. Rather, she was influenced to call another attorney who prepared such will. The second paragraph thereof devised one described farm, share and share alike, to four distant relatives living in another state, most of whom she had never even seen. The third paragraph devised an undivided one-half interest in the other de-

scribed farm to the tenant thereon, and an undivided one-half interest therein to defendant as tenants in common, all in fee simple. The fourth paragraph devised and bequeathed absolutely to such tenant and defendants each an undivided one-half interest in and to all livestock, machinery, and other personal property located and used upon said latter farm. In that connection, however, the fifth paragraph made such devises and bequests subject to encumbrance for payment by said tenant and defendants, within 6 months from the date of appointment of an executor of plaintiff's estate, of all plaintiff's doctor bills, hospital and medical bills, and expenses incidental to plaintiff's last illness and burial. It then made same a lien upon said real and personal property prior to any interest of such beneficiaries until payment was duly made by them and gave her executor power to sell in order to satisfy such liens. The sixth paragraph of the will devised and bequeathed absolutely in fee simple to plaintiff's nurse and housekeeper, Anna Sexton, plaintiff's described lots and home in Ogallala, together with all improvements thereon, and the entire contents thereof used in its occupation and enjoyment. Other devises and bequests were made but they are unimportant here. A. R. Johnson was made executor.

At or about the time such will was executed, the tenant aforesaid, who claimed to have no knowledge except that which he obtained from the surrounding "air," told defendant that the lawyer who drew such will had called at plaintiff's home and that Mrs. Sexton was going to get plaintiff's farms and home, to which defendant replied, " 'you watch me.' " Contrary to plaintiff's contention, such statement by defendant, as we view it, was only a natural reaction under the circumstances. Thereupon, defendant called upon plaintiff, and, receiving no satisfactory knowledge or explanation, he consulted his lawyer, Mr. McGinley of Ogallala, who told him to file his contract of record in order to protect his interests. Defendant then filed his contract of record

on May 26, 1951. However, thereafter he continued to perform same in every respect without interruption until enjoined from doing so on September 18, 1952. In that connection, plaintiff claimed that she did not learn that defendant had recorded their agreement until her lawyer who drew her will on May 16, 1951, had checked the records in September 1952, whereupon she filed this action. Thereafter, on January 14, 1953, plaintiff executed another will, but its provisions are of no importance here except to say that the will again devised and bequeathed plaintiff's home and all its contents to Mrs. Sexton absolutely but gave defendants nothing.

It will be remembered that Mrs. Sexton was absent because concededly disabled at the time the contract and deed were executed and delivered on July 28, 1950, and her testimony with regard thereto relates to different occasions. In that connection, defendant, Mr. DeVoe, plaintiff's attorney, and Mrs. Kuntz, her then practical nurse, were present at that time. Their testimony established by clear, satisfactory, and convincing evidence that the execution and delivery of such instruments were not procured by any mistake, undue influence, fraud, or misrepresentation, and in connection with other evidence established that defendant had fully performed the conditions of their escrow contract but thereafter, without any proper or legally effective reason, plaintiff simply changed her mind and attempted to revoke and avoid the effect of her previous valid actions.

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed. All costs in this court are taxed to plaintiffs.

AFFIRMED.