CLARENCE L. GUTTING, APPELLEE AND CROSS-APPELLANT, V. MADELINE JACOBSON ET AL., APPELLANTS AND CROSS-APPELLEES, IMPLEADED WITH MADELINE JACOBSON PROPERTIES, INC., A CORPORATION, ET AL., APPELLEES AND CROSS-APPELLEES.

167 N. W. 2d 762

Filed May 9, 1969. No. 36968.

Leo Eisenstatt, J. Patrick Green, and Eisenstatt, Morrison, Higgins, Miller, Kinnamon & Morrison, for appellants.

John W. Powers, White, Lipp, Simon & Powers, and Patrick J. Heaton, Sr., for appellee Gutting.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SMITH, J.

Clarence Gutting sought a joint venture accounting

from Eugene and Madeline Jacobson, husband and wife, and four corporations, styled Realty, Properties, Construction, and Investors. Madeline owned Realty, Properties, Construction, and most of Investors which listed two other stockholders, her sons. Managing the joint venture, composed of Clarence, Eugene, and Realty, to speculate in raw land, Madeline had platted Bel Air Village. Properties, the conduit of title, for substantial sums conveyed Lot 178 to Investors and other lots to Construction.

The district court found that Clarence had affirmed the transactions with Construction but not the conveyance to Investors. It ordered (1) an accounting by the Jacobsons, Realty, and Investors in respect to Lot 178 alone; and (2) dismissal of Clarence's petition against Properties and Construction. Appeal by the four defendants and cross-appeal by Clarence followed.

The coadventurers had agreed as of December 1, 1958, to purchase, develop, and otherwise exploit approximately 160 acres of raw land in Douglas County, Nebraska. Provisions for the speculators to furnish needed capital and to share profits and losses set Clarence's percentage at 25. Excess contributions of capital were to earn interest at 6 percent a year. Realty agreed to supply Madeline's services to operate and control the business for $1,000 a month. The coadventurers directed Realty as trustee, and therefore Properties, to execute deeds, contracts, and "all other matters only as authorized by the joint venture and with respect to normal transactions in the usual and ordinary conduct of the joint venture business."

Clarence having contributed $57,275 to capital, the coadventurers purchased the tract for $229,100. All but 10 acres were platted as Bel Air Village, bounded on the east by One Hundred Twentieth Street and on the south by West Center Road. Madeline had designed Lot 178, 20 acres forming the southeast corner of the subdivision, for a shopping center. A speculator could foresee com-

mercial values in adjoining areas like Lot 676, which measured 85 by 150 feet and fronted on West Center Road. It, part of Lot 677, and others were conveyed to Construction at fair prices for erection of model homes. Construction, after acquiring title in 1962, leased the parcel in Lots 676-77 upon which it built a Texaco station prior to November 1963.

Since the coadventurers, according to Madeline, could not realize $50,000 from selling Lot 178, she tested the lease market in 1963. While she was bargaining to lease 3.24 acres to "Food City," she organized Investors to acquire all of Lot 178. In September Properties conveyed the 3.24 acres to Investors which leased the land to Food City. The lessee began construction of a building on the premises prior to August 1964. Properties conveyed the remainder of Lot 178 to Investors in January 1964, after sale of 75 percent of the lots in the Village.

Madeline did not broach her plans for Investors to Clarence. Anxious about the fair market value of Lot 178, she consulted Coe Peppers, a builder and real estate agent employed by Construction. After deliberating days without other advice, she decided upon $80,000. It was paid in October 1964. At the trial the retrospective valuations ranged from $90,000 to $340,000. The district court correctly found $300,000 to $340.000.

Risks had been taken by Madeline and Investors on the Food City lease and other transactions unrelated to time frames of Clarence's conduct. They are sketched up to trial in August 1967. Investors subordinated ownership of three parcels to lessees' building mortgages. Food City monthly was paying $800 rental and $1,500 on its mortgage indebtedness. Investors also incurred expense in constructing Gold Street, a lighting system, storm sewer, and asphalt parking lot. Madeline obligated herself in connection with projects for three buildings to cost almost a million dollars. Success was not a foregone conclusion.

Clarence testified to reliance on Madeline, to great expectations from the enterprise. He and the Jacobsons had been close friends, the men owning an automobile sales agency in partnership from 1940 to 1965. Clarence was knowledgeable in business, but he possessed no special skill in land speculation. From 1958 through 1965 he complained to Madeline once, and then about expense to the joint venture in clearing the land of tall weeds. Without critical comment he accepted annual statements that summarized the financial condition of the joint venture, although the statements did not disclose details of sales. He knew generally of conveyances to Construction and of Madeline's interest in it. He silently watched Construction build the Texaco station. He protested after commencing this suit in May 1966.

Clarence believed, according to him, that the coadventurers would keep Lot 178. Yet no one called on him to contribute more capital. No financial statement suggested mortgage obligation or rental income. He kept well informed of the Food City construction project, for he lived nearby at 11940 West Center Road.

Clarence admitted that in late 1964 he had probably learned of the conveyance to Investors. However, he denied knowledge of the price or Madeline's interest in Investors prior to his return from a 4-month trip to Europe in October 1965. Witnesses recalled conversations with him about material facts of the transaction with Investors before October 1964. An accountant retained by all parties testified: During July through September 1964 he had informed Clarence of the price and of Madeline's intention to borrow money to pay it. Clarence, on the other hand, dated the accountant's disclosure in October 1965.

Distributions from the joint venture to Clarence totaled $126,736.87. He accepted none subsequent to these in 1964: January—$8,750; August 11—$8,000; and October 22—$15,000. In January 1966, he complained to Madeline about the price of Lot 178.

An agent in connection with the agency ought not to deal with his principal as an adverse party, unless the principal knows or consents. Restatement, Agency 2d, § 389, p. 205. See, also, Pike v. Triska, 165 Neb. 104, 127, 84 N. W. 2d 311, 325. "An agent who, to the knowledge of the principal, acts on his own account in a transaction in which he is employed has a duty to deal fairly with the principal and to disclose to him all facts which the agent knows or should know would reasonably affect the principal's judgment, unless the principal has manifested that he knows such facts or that he does not care to know them." Restatement, Agency 2d, § 390, p. 208. See, also, 2 Rowley on Partnership (2d Ed., 1960), §. 52.23, p. 493; 5 Williston on Contracts (Rev. Ed., 1938), § 1499, p. 4185.

An empowered agent who violates fiduciary duty by selling his principal's property to himself individually, holds the property upon a constructive trust for the principal. Restatement, Restitution, § 192, p. 789. A principal may by acquiescence release his agent from liability for self-dealing. Restatement, Agency 2d, § 416, comment b, p. 276.

The findings of the district court on the issues whether Clarence was entitled to an accounting are correct. The judgment is affirmed.

AFFIRMED.