CARL C. CARLSEN v. STATE OF NEBRASKA.

FILED MAY 10, 1934. No. 28976.

*Frank A. Peterson* and *Claude S. Wilson,* for plaintiff in error.

*Paul F. Good, Attorney General,* and *William H. Wright, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and MESSMORE, District Judge.

GOSS, C. J.

Defendant assigns error in a conviction for forgery. He was charged in twelve counts with the forgery of twelve interest coupons, was acquitted on four counts and was convicted on eight counts. All the coupons were due

January 19, 1934. The first four were for $9.75 each and the other eight were for $15 each. The names of Mary A. McLoughlin and Thomas J. McLoughlin appeared as the makers. Each coupon contained these words: "Payment of this coupon is subject to the terms of principal bond of even date." There are 116 assignments of error "relied upon for reversal."

Carlsen was president and active head of both the Lincoln Safe Deposit Company and the Lincoln Trust Company. January 19, 1925, Mary A. McLoughlin and Thomas J. McLoughlin obtained from the Lincoln Safe Deposit Company a mortgage loan of $13,000, secured by a mortgage on lot 15, block 16, in Havelock, on which was a three-story brick building. The loan was evidenced by a series of 30 bonds. Nine of these bonds, for $325 each, totaling $2,925, were payable consecutively, one each six months up to and including July 19, 1929. The other 21 bonds, arranged for convenient sale, in amounts of $250, $325 and $500, totaling $10,075, were all payable January 19, 1930.

In each of the 30 principal bonds signed by the McLoughlins, it was recited that the bonds were equally secured by the mortgage without any preferences or priority whatsoever of the lien thereof in favor of any one or more of said bonds over any one or more of the others; that, if default occurs, then the Lincoln Trust Company may, as trustee for the holders of the bonds, without notice, declare all bonds due; and that the makers "have * * * caused the interest coupons hereunto attached to be executed with facsimile signatures this 19th day of January, 1925."

In 1927, the McLoughlins were in default on certain of the bonds then falling due, and on September 20, 1927, signed an extension agreement as to those particular bonds. On January 14, 1929, the McLoughlins being in default on certain of the bonds still owned and held by the Lincoln Safe Deposit Company, the company began a foreclosure. This resulted in a decree for $2,894.62 in

favor of the Lincoln Safe Deposit Company as a first lien upon the premises, concurrent, however, with the right of the holders, upon subsequent default, to foreclosure as to the balance of bonds not yet due, amounting to $12,025. At the expiration of a stay taken by the Mc-Loughlins, the property was sold. It was bid in at judicial sale for $500 and the sheriff conveyed it to Lincoln Safe Deposit Company. That company took possession of the property. It had a deficiency judgment. Later it developed that the McLoughlins had a party wall affecting the title to the lot and building. The company paid them $200 for the party wall and, as a part of the settlement, canceled the deficiency judgment. This left the Lincoln Safe Deposit Company the owner of the property and in possession thereof, subject to the unpaid bonds, upon which the McLoughlins were still liable, totaling $12,025, most if not all of which were held by investing customers of the company.

On or about January 19, 1931, as of which time the facts in the information were laid, all of the original McLoughlin bonds still in existence were past due and investors who had purchased them were requesting the company to pay the principal. These owners of the bonds were evidently unaware the company had foreclosed on its own bonds and had taken title and possession. Accordingly the scheme was devised to procure what would appear to the holders of these bonds as an extension of the original bonds. As evidencing this the state introduced what is known as a "pink sheet." This is a form which was ordinarily used by the loan committee in approving either a "new loan" or an "extension loan," it being the custom to strike out either of the phrases not applicable. In this instance the words "new loan" were crossed out and the words "extension loan" were changed to read "extension coupons." Below the signatures of the loan committee approving the plan of extension coupons, under the heading of "remarks," appear the words "coupons only." The data in the pink sheet,

when approved by the loan committee, conveyed to the clerical force the order to draw extension coupons, only, for $11,700 (to which it showed the original McLoughlin loan had been reduced) for three years at the rate of 6 per cent. This approval was signed by C. C. Carlsen, J. A. Reichenbach and W. R. Mellor. None but Carlsen are informed against. In pursuance of the authority of the "pink sheet," extension coupons were made and signed with the facsimile signatures of the McLoughlins. These coupons found their way into the hands of holders of the bonds and served to satisfy them that the original bonds had been extended, though there was no real extension thereof. The McLoughlins testified that they never were asked to extend these bonds and never authorized extension coupons to be executed for that purpose. When they lost title and possession of the property by foreclosure and deed, they abandoned interest in the affair.

The evidence shows that, in any instance where the McLoughlins requested an extension, an extension agreement would be signed by them and new coupons would be attached to the particular bond thus extended. This was the general practice of the company. Defendant seeks to derive from the original bonds the authority for the execution of extension coupons where, as here, no extension agreement was made by the maker. As hereinbefore quoted, the original bonds merely recited the then existing fact that the McLoughlins had caused interest coupons with facsimile signatures to be attached to evidence the particular interest to come due on these bonds. It does not appear in its terms to authorize any one in the future to make other facsimile signatures on extension coupons, whether with or without an extension agreement.

However, it seems to have been the custom and practice of the Lincoln Safe Deposit Company to use facsimile coupons in cases where the company was the owner of the property. A witness who had worked for the company testified that there were twelve or fifteen cases

where they could not get the owners to sign an extension agreement or where the company owned the property, in which the stenciled extension coupons were used, as in the McLoughlin case. The usual method of producing a facsimile signature was to trace a genuine signature on a stencil sheet with a stylus, which is a pencil for tracing purposes, and then to run the signatures off on the coupons with a mimeograph. There is evidence indicating that the signatures of the McLoughlins, charged to have been forged, were traced from their signatures on the mortgage. The mere fact that it was the usual method to use facsimile extension coupons does not relieve the user from a charge of forgery if, in fact, the signatures were not authorized and if the effect of the act was to work an intentional fraud.

Defendant testified briefly as to exhibit 25, which is the "pink sheet," identifying his signature and those of the two other members of the loan committee whose names appear. He stated that he had no independent recollection as to when he and the others signed it or as to what was done with it after it was signed; that he never saw it after it was approved by the loan committee until the action was brought, but that he either took it or sent it to Mr. Amos' desk—at least that was the practice in such matters; the purpose of sending it to Mr. Amos would be to have whatever papers the exhibit calls for made up; that Mr. Amos' department made up these approval slips, sent them to the loan committee and, if approved, then they were sent back to him to make up "whatever the paper calls for;" he thinks the McLoughlin bonds were all sold; and after the exhibit was executed and the coupons were attached to them he never saw them until the preliminary hearing; that defendant had nothing whatever to do with carrying out the directions of exhibit 25—that was a detail worked out between the loan department and bond department.

Carl R. Amos testified he was a clerk in the loan department under defendant, its active head, who was pres-

ident of both companies and who handled their loans; he received his instructions from defendant; the bonds and extension coupons in evidence were drawn in accordance with the instructions contained in the approval sheet signed by the loan committee; when an order for "coupons only" came in he would turn it over to one of the girls to stencil the coupons either from the mortgage or from another coupon; that an examination of the McLoughlin signatures on the original mortgage shows that the coupons charged here have been traced therefrom; after coupons are prepared in this manner a record is made of them and they are sent to the bond department, where they are attached to the bonds. This witness identified an extension agreement of one of the bonds of this series where the McLoughlins actually signed the agreement and testified that in that instance the new coupons had been actually attached to the foot of the extension agreement. The witness also identified exhibit 24, which was another "coupons only" memorandum identifying the McLoughlin loan, prepared by the loan department and sent to the bond department, by virtue of which the latter department attached the coupons to the bonds.

Georgia Dworak testified she worked in the loan department for eight years; one of her duties was to draw papers; she got her orders in that respect from Mr. Amos, usually in the form of a pink sheet. Her testimony confirmed the practice of the company to use stenciled and mimeographed signatures on coupons where there was an extension agreement signed by the borrower; that the instructions "coupons only" meant that the coupons were to be produced by the stencil and mimeograph; and that there were only about a dozen instances of loans in which that was done, this being one of them.

The defendant and other witnesses connected with the company, who testified and who might have had something to do with the preparation of the coupons involved in this case, all testified that they had no independent recollection of the matter.

Several witnesses who held coupons charged in the information testified at the trial. When the original coupons were exhausted and they asked payment in 1931, they were told that the McLoughlins desired an extension of the loan, that they could not get the principal, and the like. They accordingly accepted the extension coupons for three years, believing the McLoughlins still owned the property, that there had been an extension, and not knowing that the company had foreclosed its own interest in the mortgage and owned the property; that had they known the McLoughlins had not authorized the company to put their signatures on the coupons they would not have accepted them. One of them testified she learned in March, 1932, that title was no longer in the McLoughlins. She telephoned Carlsen in regard to the McLoughlins. He said they were slow in paying. She then told him McLoughlin had informed her that the company had foreclosed two or three years ago and she asked Carlsen why he did not foreclose for her part. He answered: "Well, we didn't foreclose your part, we only foreclosed our own part." So Carlsen knew the mortgage had been foreclosed as to the bonds held by the company. Moreover, he had verified the petition for that foreclosure.

From the evidence it is clear that the McLoughlins never authorized the extension coupons, for the forgery of which defendant has been convicted, to be executed and delivered to holders of their original bonds.

Each count of the information alleged the forgery of a separate coupon, setting out the words of the coupon and the statutory elements of a forgery thereof. This recitation showed that the coupon was for an instalment of interest on a first mortgage bond and that the payment was subject to the terms of the principal bond of even date. Defendant moved to quash the information chiefly on the ground that each count showed that the instrument was a part of another instrument which was not set out; and demurred on the ground that the allegations did not constitute an offense punishable by the laws of

the state. The court overruled the motion to quash and the demurrer. These rulings are assigned as erroneous.

As to the motion to quash, it does not appear that the averment of the extrinsic facts shown by the original bond was necessary to advise defendant of the charge against him. The true rule was laid down in *Morearty v. State*, 46 Neb. 652, where the matter was not so advisory as here, being a charge of forging an order for the delivery of a trunk. The court said: "And where such an order is set forth by copy in an information charging its forgery, and it is apparent from its face or its terms that there was a possibility, by its use, to deprive some person of property rights, the information is sufficient without averment of any facts extrinsic to the instrument to extend or explain its terms."

As to the demurrer to the information, the main point is that the information charged that each coupon was forged with intent "to prejudice and defraud," whereas the statute defining forgery reads "with the intent to damage or defraud any person or persons." Comp. St. 1929, sec. 28-601. In criminal statutes, when necessary to give effect to any part of a statute or to the intention of the legislature, the word "and" may be substituted for "or", and *vice versa*. 1 Words and Phrases (Second Series) 208, and cases cited. The information was sufficient to support proof that "any person" was defrauded. It is contended that the information is defective in that it merely charges an intent to defraud, without naming a particular person to be defrauded. "In a prosecution for forgery, it is not necessary to allege or prove an intent to defraud any particular person." This was said in the recent case of *Uerling v. State*, 125 Neb. 374, and is controlling here.

Section 28-601, Comp. St. 1929, defining forgery and providing a penalty therefor, does not specifically mention interest coupons. But it does denounce one who falsely makes or forges any "writing obligatory," "contract or promissory note, for the payment of money,"

"or any signature to a letter, paper, or writing of whatsoever kind," "with the intent to damage or defraud any person or persons." In *Uerling v. State,* above cited, an interest coupon was expressly held to be the subject of forgery under section 28-601. The coupons here were writings obligatory and were, in fact as well as form, promissory notes for the payment of money. The demurrer as well as the motion to quash were properly overruled.

Defendant contends the court erred in not granting a change of venue. This was raised by the affidavits of defendant, of both of his counsel, and by 134 affidavits of other citizens. The latter were upon mimeographed forms with blank spaces for the name, age and occupation of affiant. Some were signed by women who did not read them carefully enough to change the masculine pronoun, in which form they were printed, to the feminine. These affidavits express the conclusions that, in conversations with citizens of the county, they have found sentiment very bitter against both of the companies, that the newspapers have carried items under large headlines relative to civil and criminal causes about defendant, and affiants are of opinion that it would be impossible for Carlsen to have a fair trial in the county. The affidavits of defendant and counsel were more elaborate. They included the additional feature of their estimate of many thousand of clients of the two institutions who were affected directly by the failure of the two companies and of others in the county who would be directly and indirectly affected. We are not given the *voire dire* examination of the jury nor the record of the challenges used by the parties when the jury were selected. The trial judge, who lives in the community, had better opportunities than we to consider the evidence of the fitness and fairness of jurors. These matters repose in his enlightened discretion. If he had granted a change of venue we could not have disturbed it. That he did not allow it is not, in view of the circumstances, an abuse

of discretion. It is the rule that "A motion for a change of venue is directed to the discretion of the trial judge, and unless an abuse thereof is disclosed by the record his ruling will not be reversed in the supreme court." *Hauser v. State,* 101 Neb. 834.

Error is assigned because the court permitted William H. Wright to participate in the prosecution. Paul F. Good, attorney general, was present at the beginning of the trial and, in answer to an inquiry of counsel for defendant, directed to the county attorney and to the attorney general, stated that Mr. Wright was a duly appointed, qualified, and acting assistant attorney general, who would appear and assist in the prosecution, acting for the attorney general and in no other way. The county attorney stated that he had requested the assistance of the attorney general. It was stipulated that Mr. Wright was not the deputy but was an assistant attorney general and was not under bond as the deputy attorney general is required by statute to be. Comp. St. 1929, sec. 12-119. Under section 84-206, Comp. St. 1929, the attorney general has power to appoint a deputy who, upon giving the bond required, is authorized, in the absence of the attorney general, to perform all acts and duties of his superior officer. So it was held in *Lower v. State,* 106 Neb. 666, relied upon by defendant, that an assistant attorney general could not make and sign an information in his own name, as had been done in that instance. This was based upon what is now section 29-1602, Comp. St. 1929, requiring an information to be filed by the county attorney. It also held: "The assistant attorney general is the agent of the attorney general, and not an independent officer, and his official acts must be performed in the name of his principal." Authority for the ruling of the court in permitting the assistant attorney general to participate with the county attorney in the trial here is found in *In re Estate of Creighton,* 91 Neb. 654, where the syllabus says: "When it is the duty of the attorney general to appear in an action or legal proceeding, he

may authorize other members of the bar to appear for him, and pleadings or other papers executed in his name by responsible members of the bar of this court will not be disregarded upon the sole ground that the attorney general must appear in person, and with no suggestion that such appearance was not duly authorized." Here the authorization was expressly made by the attorney general. There was no error in the ruling.

Defendant complains because judgment was entered on the eight counts, whereas defendant was acquitted upon four counts where the intent must have been just the same. In *Weinecke v. State,* 34 Neb. 14, the court said: "The evidence would have justified a conviction under both counts of the information. Both offenses were committed by the same person and at the same time. It is, indeed, unexplainable how the jury arrived at the verdict returned. As a separate offense is charged in each count, the verdict is not void. The defendant cannot complain because he was acquitted of the first offense. The error was in his favor."

Complaint is made of instruction No. 17, given by the court, in which he told the jury, among other things, that the original bonds gave the company, its officers or agents, the right to affix interest coupons with facsimile signatures of the McLoughlins, but that this authority did not continue indefinitely; that the right was limited to those coupons attached at the time the bonds were originally executed. This instruction stated the facts. There is not pointed out a scintilla of evidence to the contrary. Of course, the court gave the rule because so much was said in the trial, as here, about the right of the company to make other facsimile signatures after the originals were paid. There was no error on this point.

Error is charged in the giving of instruction No. 18, reading as follows:

"If you find the defendant either guilty or not guilty of the charge in each and all of the twelve counts, as set out in the information, you may return a general

verdict to that effect. However, should you find the defendant guilty of only part of the said twelve counts and not guilty as to the others you should enumerate in your verdict the particular counts on which you may acquit or convict as the case may be upon the blank verdict form."

This is a concise statement of the situation confronting the court. He could not instruct the jury either that the defendant was guilty or innocent on all of the twelve counts, nor could he instruct them that if defendant was guilty on one count he was guilty on all or that if he was innocent on one he was innocent on all. To do so would invade the province of the jury. There seems no other practical way to handle the matter. Yet counsel argue that such an instruction encourages a jury to compromise without any proper basis and encourages speculation and conjecture. No better way was suggested to cover the situation. It was cared for conventionally and we see no error in the instruction.

Perhaps the most important contention of defendant is that the evidence is not sufficient to support the verdict. We have sketched the evidence so that the facts sufficiently show that what was done by defendant was enough to support a verdict against him. There is no need to review them further or to amplify them. He, as an executive as well as an individual, set in motion the forces that resulted in carrying out, by means of the forgery of new and unauthorized coupons, the scheme which the jury has found possessed an intent to defraud. The business of making the coupons without authority of the McLoughlins and without any extension agreement was ordered by the pink sheet and was forwarded by the machinery of the office which was under his domination and direction. The orders were his. That they were carried out by some clerk (who is not charged) does not relieve him. If one procure another to commit any offense he may be prosecuted and punished as a principal. Comp. St. 1929, sec. 28-201. No word or act of his

sought to arrest the movement of the plan after its operation was begun. Under all the evidence, it was competent for the jury to find that he was as guilty of the forgery of the new coupons as if he had fashioned them with his own hands. The facts and circumstances were sufficient to point to his guilt, which the jury have found. We are of the opinion that the evidence was sufficient to support the verdict.

Defendant has assigned many other errors. We have examined them and find them without merit. A discussion of them would afford no new rule of law and so we omit it.

The judgment of the district court is

AFFIRMED.