**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF SIOUX FALLS, Plaintiff and Appellant,**

v.

**UNION BANK & TRUST, now United National Bank, Defendant and Appellee.**

No. 12225.

Supreme Court of South Dakota.

Reassigned March 25, 1980.

Decided April 16, 1980.

Rehearing Denied May 22, 1980.

Gale E. Fisher, Sioux Falls, for plaintiff and appellant.

F. M. Smith of Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellee; Gene E. Pruitt of Willy, Pruitt, Matthews, Hurd, Farrell, Frankman & Johnson, Sioux Falls, on the brief.

WOLLMAN, Chief Justice (on reassignment).

Plaintiff appeals from the judgment entered denying its claim for recovery against defendant. We affirm.

The facts of the case are not in dispute on the salient issues. Briefly stated, one Mary Apland while in the employ of plaintiff as a teller had authority to make checks payable to customers and others in the ordinary course of her employer's business. She and the other tellers were authorized to use a check-imprinting machine for this purpose that bore the facsimile signature of one of plaintiff's vice-presidents, Frank Everett. The usual occasions for the issuance of plaintiff's checks by its tellers were upon withdrawal of funds by customers from their savings accounts and upon the making of share loans advanced against a customer's certificate of deposit or passbook. It was a practice of plaintiff to make such checks payable to third persons when requested by a customer to do so and then to entrust the check to the customer to dispose of the proceeds as he or she saw fit. Such third-party checks were frequently made payable to banks in connection with transfer of a customer's funds or payment of a customer's loan. Both plaintiff's vice-president and treasurer testified that this procedure was permitted by plaintiff to save their customers "the bother" of having to endorse the checks themselves. These checks bore no indication on their faces identifying the customer's account or the purpose of the check. Payee banks dispensed the proceeds per the request of the customer presenting them to accommodate plaintiff's practice. This procedure clearly had plaintiff's approval. Defendant relied on this practice in accepting the checks in question and paying them to Mrs. Apland either by cash or by deposit to her account.

The checks in question were part of a fraudulent scheme whereby Mrs. Apland would prepare fictitious share loan documents, forging the necessary customer's signature. She would then issue a check representing the proceeds of the fictitious loans payable to defendant bank. She imprinted the facsimile signature of Frank Everett on these checks so that they appeared to be authentic checks issued pursuant to a bona fide transaction. She drafted twenty-three such checks. No notation identifying either a customer's account or the purpose of the transaction appeared on these checks. Mrs. Apland was a depositor, customer, and debtor of defendant bank. Plaintiff did not have an account with defendant. The drawee-payor of these checks was the Northwestern National Bank of Sioux Falls.

Over the course of approximately two years, Mrs. Apland took twenty-three such checks to defendant. There, pursuant to her directions, defendant either credited her personal account or paid her cash or both for each check. Although one of defendant's tellers apparently knew that Mrs. Apland was employed by plaintiff, the tellers accepting these checks were not aware of what position she held. Defendant dealt with her as a mutual customer of itself and plaintiff. From time to time Mrs. Apland made payments on her and her husband's personal loans with defendant after depositing in her account the proceeds from some of these checks; however, there is no evidence in the record that any of these checks were applied in direct payment of any of her personal loans. Also, on occasion, Mrs. Apland would deposit proceeds from these checks to her account in response to a notice from defendant that her account was overdrawn.

After crediting the amount of one of these checks to Mrs. Apland's account or paying her cash or both, defendant would place its forwarding endorsement on it without any indication of the manner in which or to whom the funds had been dis-

bursed. The checks were then forwarded to the drawee-payor bank, Northwestern National Bank of Sioux Falls, which then paid its funds over to defendant bank and debited plaintiff's account for the amount of the check.

The twenty-three checks were written and cashed over the period from July 13, 1972, to August 20, 1974, before the defalcations were discovered by plaintiff on the last Friday in August 1974. This suit followed. Plaintiff seeks to recover the aggregate amount of these checks on the theory of money had and received.

## I

Plaintiff argues that the trial court erred in granting a directed verdict to defendant and in refusing to grant plaintiff's motion for directed verdict.

■ A motion for directed verdict raises the question of legal sufficiency of the evidence, and the trial court must accept that evidence in the light most favorable to the non-moving party. *Northwest Realty Co. v. Perez*, 81 S.D. 500, 137 N.W.2d 345 (1965); *Langdon v. Reuppel*, 81 S.D. 289, 134 N.W.2d 293 (1965).

The evidence is undisputed that none of the proceeds of the checks in question were in fact received and retained by defendant. Instead, they were disbursed at Mrs. Apland's direction in accordance with commercial practices used, condoned and encouraged by plaintiff for the convenience of its customers; i. e., allowing third parties to be named as sole payees on checks issued by plaintiff without any identification on the check of the account owner or the underlying purpose of the transaction.

South Dakota's version of the Uniform Commercial Code establishes the basic rules for commercial transactions such as those in issue here. SDCL 57–1–1. SDCL 57–13–13 (UCC 3–406) provides:

Any person who by his negligence substantially contributes to . . . the making of an unauthorized signature is precluded from asserting the . . . lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

The official comment states that this section applies to negligence that contributes to a forgery or other unauthorized signature as defined by SDCL 57–1–2 (UCC 1–201). "The most obvious case is that of a drawer who makes use of a signature stamp or other automatic signing device and is negligent in looking after it." 2 Uniform Laws Annotated, U.C.C. (Master Ed.) § 3–406 at 349, note 7.

■ SDCL 57–1–2(39) (UCC 1–201(43)) defines an "unauthorized" signature as "one made without actual, implied or apparent authority and includes a forgery." An employee's conduct shows intent sufficient to constitute that required for the crime of forgery

where he voluntarily acts beyond his authority for the purpose of defrauding. Where, however, the agent is innocent of any conscious wrongdoing and in good faith believes that he has authority, the signature that he makes of his principal's name is not a forgery because of the fact that the agent lacks the requisite authority to act as he has.

1 Anderson, Uniform Commercial Code, § 1–201:58, at 102 (1970). Forgery of a signature occurs when "a person knows that he is not authorized as agent and signs the name of another with the criminal intent to defraud by so doing." 1 Anderson, supra, § 1–201:58, at 103.

■ As pointed out in Judge Parker's concurring opinion, since forgery is not defined by the UCC, local law controls. SDCL 57–1–25 (UCC 1–103). The record in this case supports the conclusion that Mrs. Apland's use of the mechanically reproduced signature of Frank Everett constituted forgery, for "to constitute forgery it is sufficient that the writing possess some apparent legal efficacy." *State v. Greene*, 86 S.D. 177, 186, 192 N.W.2d 712, 717 (1972). There being a forged, and hence unauthorized, signature, the question remains wheth-

er plaintiff "substantially" contributed to the making of that signature by its negligence. If so, and if defendant paid "the instrument in good faith and in accordance with the reasonable commercial standards of the . . . payor's business," plaintiff is precluded from asserting the lack of authority of the signature against defendant's defense. SDCL 57–13–13.

■ The trial court held that because plaintiff, as a matter of law, was negligent in permitting third parties to be named as sole payees on checks issued without identification of the account owner thereon and in conducting its internal control procedures, the provisions of SDCL 57–13–13 barred it from recovery. We agree.

The record indicates through the testimony of Frank Everett, plaintiff's executive vice-president and manager, that it was the practice of plaintiff to allow a customer to draw from his account and ask the teller to make the check out to some third party, another bank, for example, any time the customer requested it. The check would then be turned over to the customer without any further information being placed on the face of the check regarding name of customer, account holder, or purpose of the check.

Mary Vietor, plaintiff's treasurer, testified that under these practices, the customer's name or identification was not placed on the check itself, nor was the purpose for the check. Asked if these checks were inspected by plaintiff, Mrs. Vietor answered that the checks so issued, which totaled approximately fifty per day, were "gone through" two or three times "to get the totals" correct, and that for the inspector to check the payee on each check would have

been no help because of the procedure put into practice by plaintiff. Other banks were cashing the checks so made out by plaintiff to "accommodate the practice that First Federal itself instituted" as a convenience for its customers.

With respect to the question whether defendant acted "in accordance with the reasonable commercial standards" of its business, required under SDCL 57–13–13, it appears from the testimony of plaintiff's own witnesses that the procedures facilitating the defalcation were propagated and encouraged by plaintiff and acquiesced in by defendant for the convenience of plaintiff's customers. Although no code section specifically defines reasonable commercial standards, two sections are helpful here. SDCL 57–1–15 (UCC §1–205(1)) defines course of dealing as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." A usage of trade is "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." SDCL 57–1–16 (UCC 1–205(2)). When it is claimed that a bank has been negligent, "custom and usage may be relevant" in determining whether the allegedly negligent acts were in conformity with ordinary bank practices. 1 Anderson, supra, § 1–205:11, at 178–179. See also Annot., 8 A.L.R.2d 446, 447 § 1.

■ We conclude, then, that SDCL 57–13–13 applies to bar plaintiff's recovery, in that all of its requisite elements were established by defendant.*

---

* Defendant also argues that this is a derivative action wherein plaintiff's true claim is against Northwestern National Bank, the drawee-payor bank in this case. We agree.

In *Stone & Webster Engineering Corp. v. First National Bank & Trust Company*, 345 Mass. 1, 184 N.E.2d 358 (1962), the Supreme Judicial Court of Massachusetts stated that a valid defense waived by the drawee cannot be asserted against a collecting bank or other prior party presenting or transferring the check.

Even though the better rule seems to be that a direct right of action exists against a depositary-collecting bank, *Allied Concord Financial Corporation v. Bank of America National Trust and Savings Association*, 275 Cal.App.2d 1, 80 Cal.Rptr. 622 (1969), that action still subjects the drawer to any defenses the drawee could have interposed against the drawer under UCC 4–406(4) and (5). One of these defenses is found in SDCL 57–21–13 (UCC 4–406(4)), which provides:

Finally, we conclude that the Uniform Fiduciaries Act, SDCL 55–7, does not apply because Mrs. Apland was not acting in the capacity of a fiduciary in the role of a customer of the plaintiff and was not dealt with as such by defendant.

We have considered the other assignments of error and find them to be without merit.

The judgment is affirmed.

DUNN, J., concurs.

HENDERSON, J., and PARKER, Circuit Judge, concur specially.

FOSHEIM, J., concurs in result.

PARKER, Circuit Judge, sitting for MORGAN, J., disqualified.

HENDERSON, Justice (concurring specially).

This case falls within the ambit of the Uniform Commercial Code. SDCL 57–13–13 (U.C.C. 3–406) bars recovery of appellant's claim inasmuch as (1) the respondent paid the checks in good faith and (2) in accordance with the reasonable commercial standards that existed between these parties. While the practices in this case which facilitated the defalcation might well be viewed as ill-advised when compared to those banking practices that exist in other communities, I agree with the result. The function of the court under the U.C.C. is not to determine or delineate general standards of reasonableness in commercial transactions; rather, we are constrained to determine only whether the acts in question were reasonable in view of the course of prior conduct between the parties and the custom and usage within the particular community.

PARKER, Circuit Judge (concurring specially).

I concur in the result of the majority decision, but differ on the question of whether this is a case for the application of SDCL 57–13–13 (UCC 3–406) for the reasons hereinafter set forth.

## APPLICATION OF UCC 3–406

The threshold question in evaluating First Federal's first theory of recovery is whether the drawer's signatures were "authorized" or "unauthorized." If "unauthorized" then the case will be governed by SDCL 57–13–13 (UCC 3–406), as urged by the Bank, rather than the common-law rule urged by First Federal.

"Unauthorized signature" is defined by the Code as "one made without actual, implied or apparent authority and includes a forgery." SDCL 57–1–2(39) (UCC 1–201(43)).

Obviously, Mary Apland had actual authority to affix the facsimile signature of First Federal's then vice-president, Frank Everett, to its check blanks pursuant to her prescribed duties as one of its tellers. Equally obvious, however, is the fact that she did not have actual authority to do so pursuant to a scheme to defraud First Federal—at this juncture her use of the facsimile signature of Frank Everett became a forgery.*

Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (§ 57–21–10) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized endorsement is precluded from asserting against the bank such unauthorized signature or endorsement or such alteration.
Plaintiff is, of course, a "customer" under this statute by virtue of SDCL 57–18–9(5) (UCC 4–104(1)(e)), which states that the term cus-

tomer "includes a bank carrying an account with another bank." This statute would apply to segregate those checks that were paid more than a year prior to plaintiff's filing suit from those paid within the one-year period allowed for discovery and reporting the unauthorized signature. We need not face this question, as we hold that plaintiff's actions act as a bar to its recovery under SDCL 57–13–13.

* Since "forgery" is not defined by the Uniform Commercial Code, local law controls. SDCL 57–1–25 (UCC 1–103). "Forgery" is defined by SDCL 22–39–36 as follows: "Any person who, with intent to defraud, falsely makes . . . a written instrument of any kind . . . is

Characterizing the drawer's signature on these checks as forgeries does not automatically brand them as "unauthorized" under the Code. They can still be "authorized" if blessed by the protective aura of apparent authority. SDCL 57–1–2(39) (UCC 1–201(43)) (defining "unauthorized" signature).

Apparent authority does not depend upon actual authority for its existence and may exist without it. On the other hand, apparent authority often exists in concert with actual authority and may or may not be identical to it. Apparent authority can also survive the demise of its frequent companion, actual authority. All of this is true because apparent authority rests upon manifestations flowing from the principal to the third person as opposed to actual authority which derives from representations by the principal to his agent. 3 Am.Jur.2d Agency §§ 73–76; Restatement of Agency 2d, § 8 Comment a, § 27 Comment a, and § 49 Comment g; SDCL 59–1–5; SDCL 59–3–3; SDCL 59–6–3.

By virtue of its everyday business practice of issuing its checks bearing a facsimile signature, First Federal manifested to the Bank and the other members of the business community of Sioux Falls that its employees who affixed these facsimile signatures to its checks were authorized to do so. The Bank and others relied on this tacit representation and routinely honored such checks. Their making and issuance therefore rested upon both actual and apparent authority. The evidence fails to show that

the Bank had actual knowledge of Mary's peculations or was aware of facts sufficient to charge it with constructive knowledge. Therefore the apparent authority for the making and issuance of the checks in question continued to exist in spite of the fact that Mary violated her actual authority in making these checks. Despite their being forgeries, the signatures were not "unauthorized" because they were vouched for by the continuation of apparent authority. Since the signatures of the drawer of the checks in question were thus "authorized" under the Code, SDCL 57–1–2(39) (UCC 1–201(43)), the decision of this case is not governed by SDCL 57–13–13 (UCC 3–406).

## LIABILITY UNDER COMMON LAW

Since SDCL 57–13–13 (UCC 3–406) does not apply, the rule of First Federal's first theory must be looked to for a resolution of the question of liability. Again the rule is stated as follows:

> Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment.

9 C.J.S. Banks and Banking § 340; 10 Am. Jur.2d Banks § 529; and cases previously cited. No claim is made that First Federal was at any time either indebted to the Bank or was a customer of it.

---

guilty of forgery." Where an agent who is authorized to sign his principal's name to a check or other writing in certain transactions does so in an unauthorized transaction and with intent to defraud his principal, the signature becomes a forgery. *Carlsen v. State*, 127 Neb. 11, 254 N.W. 744 (1934); *People v. Giguiere*, 163 Cal.App.2d 453, 329 P.2d 512 (1958); *People v. Caldwell*, 55 Cal.App.2d 238, 130 P.2d 495 (1942); *Baldwin Motors, Inc. v. Aetna Casualty and Surety Co.*, 24 Conn.Sup. 498, 194 A.2d 709 (1963). See: Anderson, Uniform Commercial Code Vol. 1, § 1–201:58 at page 103 where the author, in discussing the difference between the Code definitions of "genuine" and "unauthorized," states: "While the Code defines 'unauthorized' to include forgery, this

does not require a converse implication inconsistent with the foregoing text that a forgery embraces an unauthorized signature. To the contrary, it indicates the necessity to deal with two distinct situations. The one in which a person goes beyond his authority as agent, if any, in making a signing but in his own mind intending to act as an agent. The other in which a person knows that he is not authorized to act as agent and signs the name of another with the criminal intent to defraud by so doing. That is to say, while the conscious wrongdoer in the above situation commits forgery, the person innocently exceeding his authority is merely unauthorized and does not commit forgery."

This rule is subject to an important exception: where the drawer of a check drawn to the order of a bank has clothed his agent with apparent authority to receive the proceeds of that check and the payee bank in reliance upon such apparent authority pays the proceeds to the agent or otherwise appropriates them to uses directed by the agent contrary to his actual authority, the payee bank is not liable to the drawer for such diversion of the proceeds. 10 Am. Jur.2d Banks § 560, and cases previously cited.

In determining the effect of the above rule and its exception upon the outcome of this case, it becomes necessary to reexamine the situation as it existed with respect to First Federal's custom and practice concerning its checks like the ones in question and the effect this had on the Bank's dealings with our villain, Mary Apland.

When requested to do so by one of its customers, First Federal made its check payable to a third party and gave the check to the customer with the understanding that the customer was authorized to control the disposition of the check's proceeds. Neither the customer's name nor the nature of the . transaction was noted on such checks. This practice was instituted by First Federal for the convenience of its customers. The members of the financial and business community of Sioux Falls were aware of this practice. The participation of the third-party payees in this practice was approved and encouraged by First Federal.

In instances where First Federal did not have direct business dealings with the payee bank, the transaction usually involved the transfer of funds or payment of a loan by a mutual customer of the payee bank and First Federal. Thus, payee banks routinely and without inquiry of First Federal cashed these checks and disbursed their proceeds as directed by the customers who presented them.

In such a transaction, First Federal's customer became its agent with both actual and apparent authority to direct the disposition of the proceeds of these third-party

checks (SDCL 59–3–2; SDCL 59–3–3), and if the payee bank acted in good faith and without negligence, First Federal would be bound by the acts of its customers. SDCL 59–6–3.

"Good faith" is defined by the Code as "honesty in fact in the conduct or transaction concerned." SDCL 57–1–2(19) (UCC 1–201(19)). The evidence in this case does not reveal any lack of "honesty in fact" on the part of the Bank.

The following factors combined to provide Mary Apland with a near-perfect setting for executing her devious scheme: her employment as a teller with First Federal which furnished her with knowledge of its internal procedures and access to the signature on its checks; its practice of issuing third-party checks to its customers and authorizing them to direct disposition of the proceeds; its encouragement and approval of the participation by payee banks on behalf of their mutual customers; and, Mary's private status as a customer of the Bank.

By taking advantage of this favorable climate, Mary Apland was able to deceive the Bank by posing as a customer of First Federal with apparent authority to direct the diversion of the proceeds of the checks in question to her own use. The Bank was unaware of the nature of Mary's employment with First Federal or other facts which were sufficient under the circumstances to place it on inquiry as to her authority. Therefore ·the Bank was not negligent in treating these checks as bona fide transactions pursuant to First Federal's well established practice. This being the case, the Bank is absolved from liability to First Federal by virtue of the previously stated exception to the common-law rule under which First Federal seeks recovery on its first theory.

FOSHEIM, Justice (concurring in result).

I do not agree that the signatures in question were forgeries as contemplated by the UCC. The question of Mary Apland's subjective intent is relevant only to a deter-

mination of her civil or criminal liability. It has no bearing on the respective civil liabilities of First Federal and Union Bank as between themselves. The signature stamp which appeared on the checks here in question was identical to that which appeared on all checks issued by First Federal; there was no falsification or alteration whatsoever. Thus, it was "genuine" under UCC § 1–201(18) in the sense that it was free from forgery or counterfeiting. It was, however, clearly an "unauthorized signature" (a broad definition which includes a forgery) under UCC § 1–201(43) because it was made "without actual, implied or apparent authority." I believe it is unnecessary and, perhaps, ill-advised to tie the lack of authority to the existence of criminal intent on the part of Mary Apland. For purposes of analysis in the present case, all we need find is a simple lack of authority and this properly triggers the Court's inquiry into the conduct of the parties to the suit in order to determine their respective liabilities.

More significant is the manner in which the case is decided. I believe that this action is derivative in nature and that First Federal's true claim is against its drawee-payor, Northwestern National Bank. Northwestern, however, would apparently have a complete defense in that First Federal did not exercise reasonable care and promptness to examine its statements and discover the unauthorized signature of its vice-president on the checks. Neither could it be said that Northwestern failed to exercise ordinary care in paying the items. See: SDCL 57–21–10 through 57–21–13. There is no codal basis, under the facts of this case, for allowance of a direct suit by a drawer against a depositary-collecting bank, although numerous courts have done so to avoid circuity of action (as noted in the footnote to the majority opinion). However, the cases which have allowed such suits have involved factual paradigms wherein the drawer could have recovered against the drawee-payor. It is reasoned in such cases that, because the drawee-payor would have a claim (in the amount of its liability to its drawer) against prior banks in the chain of negotiation for breach of warranties made upon presentment, there is no sound reason to disallow a direct suit. The courts have then employed an assignment or third-party beneficiary analysis to extend to the drawer the warranties made to the drawee-payor bank by those presenting or transferring the instrument. See: SDCL 57–19–13 through 57–19–15. At the same time, the depositary-collecting bank has the benefit of the defenses set out under SDCL 57–21–10 through 57–21–14. SDCL 57–19–14(2), however, suggests that no warranty with regard to the signatures could be extended to the drawer "with respect to the [effectiveness of the] drawer's own signature, whether or not the drawer is also the drawee." Thus, I see no manner in which a direct suit against Union Bank could be sanctioned here.

Finally, I have serious doubt that Union Bank can be deemed to have acted in accordance with reasonable commercial standards. While prior course of dealing and custom and usage of trade are relevant in determining what is commercially reasonable in a given setting, they should not be used to render "reasonable" *any* practice that is followed, irrespective of its commercial advisability. I agree that First Federal's negligence was more significant than that of Union Bank. I also agree with Justice Henderson that it is not our function under the Code to delineate general standards of reasonableness in commercial transactions; some flexibility is essential in view of ever-changing commercial practices. However, I believe it is manifestly unreasonable for a bank, under any circumstances, to cash a check for an individual who bears absolutely no relationship to the instrument on its face. The fact that Union Bank knew of First Federal's share-loan practices does not make its actions reasonable; that very knowledge, it seems, would have alerted it to the possibility of defalcation. However, since in my view First Federal has no true claim against Union Bank, I concur in the result.