RUSHMORE STATE BANK,
Plaintiff and Appellee,

v.

KURYLAS, INC., Defendant
and Appellant,

Internal Revenue Service,
Defendant and Appellee,

Ceasar's Inc., Neil D. Lewis and George
A. Twitero, Defendants.

No. 15764.

Supreme Court of South Dakota.

Argued Jan. 13, 1988.

Decided May 11, 1988.

Randall R. Hodge and Wayne Gilbert of Banks, Johnson, Monserud, Johnson Colbath & Huffman, Rapid City, for plaintiff and appellee.

Joseph M. Butler, James P. Hurley, Terry L. Hofer and Patrick Duffy (on the brief) of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendant and appellant.

Michael G. Lichtenberg of U.S. Dept. of Justice, Washington, D.C., for defendant and appellee.

Stephen J. Helmers and Haven Stuck of, Lynn, Jackson, Shultz & LeBrun, Rapid City, for defendants.

GILBERTSON, Circuit Judge.

### PRELIMINARY STATEMENT

This is an appeal by Kurylas, Inc. (Kurylas) concerning litigation arising from its various unsuccessful attempts to sell a motel complex. Upon review of Kurylas' claims of error purportedly committed by the trial court, we find that court to be correct and therefore affirm.

### ISSUES

In its brief, Kurylas raises eight issues in which it states the trial court committed error in ruling against it. We combine these into three issues as follows:

1. Under South Dakota's Uniform Commercial Code, is a liquor license "property" to which a valid security interest can attach?

2. Did Kurylas convert the Bank's collateral?

3. Is the United States entitled to priority of escrow funds by virtue of 26 U.S.C. § 6321?

### FACTS

Prior to 1983, Kurylas owned a motel, restaurant and lounge complex in Rapid City, South Dakota. In June of 1983 it transferred an ownership interest to Darrell Kiser (Kiser) by an exchange agreement and contract for deed. Thereafter, the property was transferred to Motel Company, Inc. and subsequently to Cea-

sar's, Inc. (Ceasar's). After a default by Ceasar's, it ultimately was returned to Kurylas.

The many facts of this case are essential to a proper analysis of the issues involved in this appeal. For sake of clarity, these facts are set out in the following chronological order:

June 11, 1983  Kurylas transfers an interest in realty, fixtures, inventory, equipment and liquor licenses to Kiser by exchange agreement and contract for deed. Kurylas reserves a security interest in the personal property.

June 23, 1983  Motel Company is incorporated.

July 1, 1983  Kiser transfers his interest in realty, fixtures, inventory, equipment and licenses by assignment of the exchange agreement and contract for deed to Motel Company. Kurylas expressly consents to this transfer of the exchange agreement and contract for deed.

August 1, 1983  Rapid City Common Council approves transfer of the on-sale and off-sale liquor licenses from Kurylas to Motel Company.

February 4, 1984  Kiser and Motel Company execute an exchange agreement and contract for deed transferring their interest in the realty, fixtures, inventory, equipment and licenses to Neil D. Lewis (Lewis) and others as trustees for Ceasar's, a corporation to be formed. Kurylas refuses to consent to this transfer, but Lewis, d/b/a Ceasar's, obtains possession of the motel premises notwithstanding.

February 9, 1984  Kurylas, Kiser and Motel Company execute a consent to transfer of the property to Ceasar's.

February 21, 1984  Ceasar's is incorporated.

March 5, 1984  Rapid City Common Council approves transfer of liquor licenses from Motel Company to Ceasar's.

November 13, 1984  Kurylas files a financing statement identifying Kiser as debtor.

December 11, 1984  Ceasar's executes a security agreement in favor of Rushmore State Bank (Bank) in all inventory, accounts, equipment and general intangibles.

December 13, 1984  Bank files a financing statement identifying Ceasar's as its debtor.

January 13, 1985  Ceasar's purchases Motel Company stock.

April 11, 1985  Ceasar's, Lewis and Motel Company provide Kurylas a deed in lieu of foreclosure for the motel and its personal property. They further execute a consent to foreclosure by Kurylas. Kurylas leases motel back to Lewis and Ceasar's.

April 15, 1985  Kurylas files a financing statement identifying Lewis as debtor.

June 4, 1985  Kiser provides Kurylas a deed in lieu of foreclosure for the real and personal property constituting the motel.

June 18, 1985  Escrow account established by Bank whereby Lewis is to make rent payments for motel; payments are to be released to Kurylas December 1, 1985, and thereafter or upon default, whichever occurs first.

July 1, 1985  Ceasar's makes its first rental payment into escrow account.

July 21, 1985  Ceasar's makes its second rental payment into escrow account.

August 19, 1985  IRS attaches escrow account for failure of Ceasar's to pay various taxes.

September 9, 1985  Ceasar's makes its third rental payment into escrow account.

October 7, 1985  Ceasar's makes its fourth rental payment into escrow account.

October 15, 1985  Kurylas claims that Lewis and Ceasar's are in default for nonpayment of rent under the lease.

November 1, 1985  Ceasar's defaults on a $20,000 note dated January 21, 1985, in favor of Bank.

November 4, 1985  Ceasar's defaults on $50,000 and $25,000 notes dated September 5, 1985, in favor of Bank.

November 6, 1985  Kurylas takes possession of the motel and related personal property from Lewis and Ceasar's.

November 18, 1985 Rapid City Common Council approves transfer of liquor licenses from Ceasar's to Kurylas.

December 4, 1985 Bank commences this action to settle various claims over motel assets and debts as between itself and Kurylas. Ceasar's and Lewis are also named as defendants for collection of notes and a guarantee. In addition, the court was asked to determine priority as to ownership of the escrow account between the IRS and Kurylas.

## ISSUE I

### UNDER SOUTH DAKOTA'S UNIFORM COMMERCIAL CODE, IS A LIQUOR LICENSE "PROPERTY" TO WHICH A VALID SECURITY INTEREST CAN ATTACH?

The trial court held that the liquor licenses, presently in the name of Kurylas, were subject to a valid security interest previously given to Bank by the former license holder, Ceasar's, Inc. Kurylas challenges this holding on the grounds that under South Dakota law, a liquor license is not "property," and thus does not fall within the scope of our state's UCC (Uniform Commercial Code). "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....'" *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494, 501 (1985).

Many other jurisdictions have faced this issue with various results and rationales. While these decisions are of some value in the context of analysis of the UCC, it is apparent that a proper review of the issue greatly depends on South Dakota's unique

liquor statues and our state's definition of "personal property." "The Twenty-first Amendment grants the States virtually complete control over ... how to structure the liquor distribution system." *Cal. Retail Liquor Dealers Assn. v. Midcal Alum.*, 445 U.S. 97, 110, 100 S.Ct. 937, 946, 63 L.Ed.2d 233, 246 (1980).

Under our state's version of the UCC, parties may create a security interest in personal property which includes general intangibles. *See* SDCL 57A-9-102(1)(a). If a liquor license is found to be personal property rather than a privilege, it must be a general intangible as it clearly does not fit any other categories of personal property described in the code. Under SDCL 57A-9-106, general intangibles are defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money." The UCC, however, fails to define what constitutes "personal property." Where such definitions are not contained within the confines of the UCC, other statutory definitions control. SDCL 57A-1-103. *First Federal v. Union Bank & Trust*, 291 N.W.2d 282, 285 (S.D.1980).[1]

South Dakota has a general definition of personal property found in SDCL 2-14-2(17): personal property includes "money, goods, chattels, things in action, and evidences of debt." This definition does not include licenses.[2] Therefore, were this definition held to be exclusive, it would settle the issue in favor of Kurylas.[3] However, as a general rule, this court has held that property interests should be liberally, rather than strictly, construed. *Carlson v. Hudson*, 277 N.W.2d 715, 719 (S.D.1979). This court has recognized various other property interests which clearly fall outside

---

1. The Eighth Circuit Court of Appeals, *In re O'Neill's Shannon Village*, 750 F.2d 679 (8th Cir. 1984), relied on the official comments of UCC 9-106 to supply this definition. As the official comments to the code were never adopted by the South Dakota Legislature, they are not binding statutory authority. *Sanborn County Bank v. Magness Livestock Exchange*, 410 N.W.2d 565, 568 (S.D.1987) (Miller, J., concurring in result).

2. SDCL 1-26-1(3) defines a license as "the whole or part of any agency permit, certificate, approval, registration, charter, or similar form of permission required by law."

3. This definition of personal property has remained unchanged since 1903. *See* § 2469(3) of that code. Since this definition existed during South Dakota's experiment with prohibition from 1917 to 1934, it obviously does not include liquor licenses.

of this statutory definition.[4] Thus, in order to determine whether a liquor license is a property right or a mere privilege, we must compare our liquor statutes and the UCC.

Statutes are to be construed to give effect to each statute and so as to have them exist in harmony. *State v. Woods,* 361 N.W.2d 620, 622 (S.D.1985); *Matter of Exploration Permit Renewal,* 323 N.W.2d 858, 860 (S.D.1982). It is a fundamental rule of statutory construction that the intention of the law is to be primarily ascertained from the language expressed in the statute. *Petition of Famous Brands, Inc.* 347 N.W.2d 882, 884 (S.D.1984). In addition, we are statutorily mandated to interpret uniform laws such as the UCC "to effectuate its general purpose to make uniform the law of those states which enact it." SDCL 2–14–13. *See also* SDCL 57A–1–102.

It is the generally held rule in other jurisdictions that as between the state and a licensee, there exists no property right in the license but merely a privilege to conduct that state regulated business. *Gibson v. Alaska Alcoholic Beverage Control Bd.,* 377 F.Supp. 151 (D.Alaska 1974); *Roehm v. Orange County,* 32 Cal.2d 280, 196 P.2d 550 (1948); *Weller v. Hopper,* 85 Idaho 386, 379 P.2d 792 (1963); *State v. Saugen,* 283 Minn. 402, 169 N.W.2d 37 (1969); *Harding v. Bd. of Equalization,* 90 Neb. 232, 133 N.W. 191 (1911); *Nelson v. Naranjo,* 74 N.M. 502, 395 P.2d 228 (1964); *In re Revocation of Liquor Lic.,* 72 Pa.Commw. 367, 456 A.2d 709 (1983). While this court has never directly addressed this issue, it has referred to the right to sell alcoholic beverages as a privilege. *Affiliated Distillers Brands Corp. v. Gillis,* 81 S.D. 44, 130 N.W.2d 597 (1964); *Burke v. Collins,* 18 S.D. 190, 99 N.W. 1112 (1904). An ex-

amination of our liquor statutes supports this majority position.

■ A liquor license is for a period of only one year and wide discretion is granted the local governing body and the state in determining whether it is issued or denied. *Randall's–Yankton, Inc. v. Ranney,* 81 S.D. 283, 134 N.W.2d 297 (1965). More significantly, the license can be voted out of existence by a municipal election before its expiration and its holder is entitled to no compensation for its loss other than a prorata refund of the license fee. SDCL 35–3–13, 35–3–15, 35–3–16 and 35–3–27.[5] We note that the license holder is granted fundamental due process rights such as a hearing, notice thereof and a right to be heard at such proceedings when consideration is given to grant, renew or revoke a license. However, such due process rights are guaranteed by the Constitution to license holders as well as property owners. *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Affiliated Distillers Brands Corp. v. Gillis,* 81 S.D. 44, 130 N.W.2d 597 (1964). Thus, there clearly is no general property right in the license in South Dakota as between the state and the licensee.

There remains, however, a second legal doctrine recognized by most of the jurisdictions cited above that there are property rights in the license as between the licensee and third parties such as creditors. These courts find no conflict with this position and the general rule that no property right exists as between the state and the licensee. *Gibson, supra; Roehm, supra; Weller, supra; Saugen, supra; Nelson, supra.* Kurylas admits that this majority finds a property right, often based on an analysis of the UCC, but counters that in South Dakota such a position is prohibited

---

**4.** In *Lee v. South Dakota Dept. of Health,* 411 N.W.2d 108 (S.D.1987), this court determined that the existence of a public employee's interest in his job was created by state regulations. *In Appeal of Schramm,* 414 N.W.2d 31 (S.D.1987), this court further found that a professional has a property right in his license to practice his qualified profession. *See also* SDCL 13–43–9.1 concerning a teacher's property right to continued employment in a teaching position for

which he or she is qualified. *Collins v. Wakonda Ind. School Dist.,* 252 N.W.2d 646 (S.D.1977).

**5.** This is a far cry from the value of these state-granted licenses in the marketplace. In the case at bar, an appraiser gave uncontradicted testimony that the off-sale and on-sale licenses had a commercial value of $75,000 to $90,000 on the Rapid City market. In *Shannon Village, supra,* the commercial value of the on-sale license was $90,000 on the Sioux Falls market.

by the terms of our alcoholic beverage code. (SDCL Title 35) Kurylas maintains that granting a security interest in a liquor license is forbidden by SDCL 35–2–7,[6] which prohibits any transfers which are not state-approved "bulk transfers" where the transfer is to another party. However, the granting of a security interest is clearly not a bulk transfer exclusively controlled by that section. SDCL 57A–9–111 specifically mandates that "a security interest is not a bulk transfer." *See also Shannon Village, supra* at 681–682. Such bulk transfers are completed under SDCL 35–2–7 when the transferee obtains a new license from the appropriate local governing body and the State of South Dakota.[7]

SDCL 35–1–4 states that no person shall "produce, transport, store or sell any alcoholic beverage except as authorized under the provisions of this title." This statute does not attempt to regulate or forbid the granting of a security interest in the license. Further, it has been held that "wherever the legislature has made licenses assignable or transferable, and the transfer can be effected with the consent of the authorities to anyone qualifying under the statute, the property element in the license is sufficiently recognized to warrant its exposure to seizure by the creditors of the licensee." *Saugen*, 283 Minn. at 405, 169 N.W.2d at 40. The court in *Saugen* found the existence of such a property right based on Minnesota statutes which are similar to those found in the South Dakota code:

1. The license was specifically related to a particular location. *See* SDCL 35–4–74 and 75.

2. The number of licenses which can be issued is limited by law. *See* SDCL 35–4–10 through 35–4–11.1.

3. Upon the licensee's death, a personal representative may operate the license; it does not automatically expire. *See* SDCL 35–2–8.

4. The license is transferable to another person with consent of the appropriate governmental authorities. *See* SDCL 35–2–7.

5. The license could be revoked only for cause and after notice and hearing. *See* SDCL 35–2–13 and *Application of Ed Phillips and Sons*, 86 S.D. 326, 195 N.W.2d 400 (1972).

*See also Weller, supra; Hom Moon Jung v. Soo*, 64 Ariz. 216, 167 P.2d 929 (1946); *Deggender v. Seattle Brewing*, 41 Wash. 385, 83 P. 898 (1906). Thus the clear import of our alcoholic beverage code recognizes the existence of a valuable property right in the license as between the licensee and third party creditors. Therefore, under the UCC it clearly can become a general intangible subject to a security interest in favor of a creditor.

Those cases cited by Kurylas which have refused to find the existence of a property right have done so on the basis that the

6. SDCL 35–2–7 provides:

   Any license granted under this title may be transferred to a new location or to another person. If the transfer is to another person, the licensee must show in writing, under oath, that he has made a bulk sale of the business operated under the license. The bulk sale may be conditioned upon the granting of a transfer of the license. The transferee must make an application exactly as if an original applicant, and the application shall take the same course and be acted upon as if an original application. No transfer of any license to another person may be granted until all municipal and state sales taxes incurred by the transferor as a result of the operation of the licensed premises have been paid. If the transfer is to a new location, the licensee must make application showing all the relevant facts as to such new location, which application shall take the same course and be acted upon as if an original application. In case of any transfer of any license affected by this title, a fee of one hundred fifty dollars is required to continue the unexpected portion of the license.

7. In its complaint, Bank asked for a court-ordered transfer of the license based solely on its security interest in the license. The learned trial court was clearly correct in refusing to grant such relief. Such a judicially-mandated transfer is not authorized by the legislature under SDCL 35–2–7, which is the sole method as to how to acquire a liquor license in this situation. A holder of a security interest who has foreclosed his interest in court must still meet the qualifications of SDCL Title 35 and secure the discretionary approval of the local governing body and the South Dakota Department of Revenue before he becomes the new licensee.

applicable state liquor code specifically requires such a result. *In re Revocation of Liquor License, supra; Matter of Eagles Nest, Inc.,* 57 B.R. 337 (Bkrtcy.N.D.Ind. 1986); *In re Rudy's, Inc.,* 23 B.R. 1 (Bkrtcy.E.D.Mich.1981). This may be an appropriate treatment of the issue, but such a determination is left to the political arena, and our legislature has chosen the other alternative, that being the recognition of "commercial reality" that a liquor license is frequently the most valuable asset that this type of .business can own.[8]

Thus we join with the majority of jurisdictions that have decided this issue and hold that our laws allow a creditor to take a security interest in a licensee's liquor license as it is property between those two parties. *Bogus v. American National Bank,* 401 F.2d 458 (10th Cir.1968); *Paramount Finance Co. v. United States,* 379 F.2d 543 (6th Cir.1967); *In re Coed Shop, Inc.,* 435 F.Supp. 472 (N.D.Fla.1977), *aff'd* 567 F.2d 1367 (5th Cir.1978); *In re Camelot Court, Inc.,* 21 B.R. 596 (Bkrtcy.D.R.I. 1982); and those cases already cited herein.

### ISSUE II

### DID KURYLAS CONVERT BANK'S COLLATERAL?

The trial court held that Kurylas converted Bank's collateral on November 6, 1985, when Kurylas took possession of the motel complex and related personal property and thereafter obtained transfer of the on-sale and off-sale liquor licenses. A determination of whether Kurylas converted the collateral in question involves a comparison of Bank's interest in that collateral with the interest of Kurylas, since each party asserts a security interest in the same property. We must decide which party has priority to the collateral and thus lawful right to

possession under SDCL 57A–9–301 and 57A–9–312(5)(a).

### A. Was Kurylas' Security Interest Extinguished by an Authorized Disposition?

The trial court found that the security interest Kurylas retained when it dealt with Kiser was extinguished thereafter by an authorized disposition, thus giving Bank a superior security interest in the inventory, accounts, and liquor licenses as of December 11, 1984. Any interest Kurylas obtained in the April 1985 transaction was inferior to Bank's prior perfected security interest pursuant to SDCL 57A–9–312(5)(a).

There is no doubt that Kurylas consented to the disposition of the collateral in his exchange agreement with Kiser:

The Purchaser agrees not to assign this Agreement or sell or otherwise dispose of any interest in the real property described herein, either in whole or in part, to any other person, firm or corporation, without first receiving Seller's permission, and said permission cannot be unreasonably withheld.

This contract may not be assigned nor may the underlying property be sold without the written consent of the Sellers. Such written consent shall not be unreasonably withheld. *It is the intent of this paragraph to adequately protect the Seller's security and not to restrict the sale or other alienation of the property, by the Purchaser hereunder. Seller agrees that Purchaser may assign this Agreement to a corporation to be hereafter formed.* Such assignment shall not however, relieve Purchaser of any obligations assumed hereunder. (emphasis added)

As authorized by Kurylas, the assignment of this agreement was executed by Kiser one week later in favor of Motel Company,

---

**8.** *Shannon Village, supra,* is the only reported decision addressing this issue in the context of the South Dakota UCC. *In re Roberts,* 358 F.Supp. 392 (D.S.D.1973), cited by Kurylas, is not a case which deals with the UCC. If our legislature disagreed with the *Shannon Village* interpretation of our commercial code, it had four years to legislatively overturn the holding. Yet a liquor license remains absent from the list of items in which a creditor cannot take a security interest. *See* SDCL 57A–9–104. *See also In re Boufsko,* 44 B.R. 98 (Bkrtcy.E.D.Mich. 1984) (footnote 5). In the past, when the legislature has not agreed with a judicial interpretation of a statute, it has acted to overturn that interpretation concerning both alcoholic beverages, SDCL 35–11–1 and 35–11–2, and the UCC. 1986 S.D. Session Laws ch. 410.

Inc. Bank claims that Kurylas' security interest was terminated by this assignment on July 1, 1983, and that by failing to protect itself by not obtaining a new security agreement and financing statement from the assignee, Motel Co., Inc., Kurylas became an unsecured creditor. SDCL 57A–9–105(1) and Comment (2). Kurylas argues that its written consent given pursuant to the exchange agreement is contingent on its security interest remaining attached to the collateral.

SDCL 57A–9–201 states: "Except as otherwise provided by this title a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." The "otherwise provided" referred to in that section which is pertinent to this case is found in SDCL 57A–9–306(2) and 57A–9–402(7). SDCL 57A–9–306(2) reads as follows: "Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized by the secured party in the security agreement or otherwise....*" (emphasis added) This court has recognized that an "authorized disposition" or "consent to sale" has the effect of extinguishing a security interest and thus the transferee takes free of the security interest. *Aberdeen Production Credit v. Redfield Livestock,* 379 N.W.2d 829 (S.D.1985). *See also Swift v. Jamestown Nat. Bank,* 426 F.2d 1099 (8th Cir. 1970). Under SDCL 57A–9–306(2), the burden is on Bank to show that the authorization to sell was given by Kurylas in the (1) security agreement or (2) otherwise, if it is to prevail. *United States v. E.W. Savage & Son, Inc.,* 343 F.Supp. 123, 125 (D.S.D. 1972); *Aberdeen PCA, supra* at 831. Unlike *Aberdeen PCA,* this case concerns a consent to sale clause in the security agreement, and therefore, the question of other outside consent to sale by the secured party does not arise.

We thus must determine what constitutes an "authorization" for sale. In the context of this case, is an authorization by a secured party an all or nothing proposition which, if given, waives the creditor's rights to its secured interest? Or may that party give an authorization to which conditions may be attached, such as the continuation of the security interest in the collateral after sale?

Kurylas cites a line of cases which hold that

> when a security agreement expressly prohibits the disposition of collateral without the written consent of the secured party, in order for a court to find an authorization permitting disposition free of the security interest within the meaning of section 9–306, subdivision (2), there must either be actual prior or subsequent consent in writing by the secured creditor *manifesting a purpose to authorize the disposition free of the security interest.*

*Central California Equipment v. Dolk Tractor,* 78 Cal.App.3d 855, 862, 144 Cal. Rptr. 367, 371 (1978). (emphasis added) *See also Matter of Franchise Systems, Inc.,* 46 B.R. 158 (Bkrtcy.N.D.Georgia 1985); *In re Southern Properties, Inc.,* 44 B.R. 838 (Bkrtcy.E.D.Va.1984); *Matter of Matto's, Inc.,* 8 B.R. 485 (Bkrtcy.E.D.Mich.1981); *Baker PCA v. Long Creek Meat Co.,* 266 Or. 643, 513 P.2d 1129 (1973).

The key factor in the line of authority cited by Kurylas is that all of the secured creditors had perfected their security interest. Thus the effect of SDCL 57A–9–402(7) came into play: "A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer." The benefit of perfection to the creditor is more specifically addressed by Official Comment 8 to UCC § 9–402: [9]

> Subsection (7) also deals with a different problem, namely whether a new filing is

9. As noted at footnote 1, the Official Comments are not statutorily binding on this court. They are nevertheless helpful as guidance, *Sanborn County Bank, supra,* especially in light of SDCL 2–14–13 and SDCL 57A–1–102(2)(c), which call for uniform construction of acts such as the UCC.

necessary where the collateral has been transferred from one debtor to another. This question has been much debated in preCode law and under the Code. This article now answers the question in the negative. Thus, any person searching the condition of the ownership of a debtor must make inquiry as to the debtor's source of title, and must search in the name of a former owner if circumstances seem to require it.

The problem with Kurylas' reliance upon the authority cited above is that it does not fit the facts of this case. When Kurylas consented to the transfer of the property from Kiser to Motel Co., Inc., on June 1, 1983, it was not a holder of a perfected security interest since it had not filed a financing statement. SDCL 57A-9-302(1). Kurylas thus was denied the protection afforded a perfected secured party under SDCL 57A-9-402(7).

Kurylas nevertheless was a holder of an unperfected security interest on that date. SDCL 57A-1-201(37) and 57A-9-203(1). That is made clear by the contract for deed and exchange agreement between himself and Kiser. Thus, the question arises whether Kurylas had the right as an unperfected holder of a security interest to condition the approval of the transfer of the collateral from Kiser to Motel Co., Inc. on the requirement that its unperfected security interest continue on in the collateral.

SDCL 57A-9-306(2) speaks only of a "disposition." Unlike SDCL 57A-9-402(7), there is no mention of any type of conditional disposition. This has led the Supreme Court of Idaho to conclude:

[Comment three of UCC § 9-306] states: "The transferee will take free whenever the disposition was authorized ..." Therein, no distinction is made between conditional authorization or any other kind of authorization. As between a third party purchaser who agreed to no condition and the security holder which permitted the goods to be placed on the

market, clearly the third party has superior right to the goods.

*Western Idaho Production Credit v. Simplot Feed,* 106 Idaho 260, 678 P.2d 52, 56 (1984). This rationale is also in accord with our long-standing principal of statutory construction that the legislature said what it meant and meant what it said. *Crescent Electric v. Nerison,* 89 S.D. 203, 232 N.W. 2d 76 (1975).

Such a holding is also in harmony with the UCC's goal of preventing secret liens. *In re Hodge Forest Industries, Inc.,* 59 B.R. 801 (Bkrtcy.D.Idaho 1986); *In re Vieths,* 9 UCC Rep.Serv. (Callahan) 943 (Wis. 1971). The cases cited by Kurylas are also exclusively disputes between the original secured party and subsequent transferees. Here the dispute is between a seller and Bank, an innocent third party. To expand the doctrine of conditional assignments in this case would in effect make Bank an insurer of the obligations originally assumed by Kiser and Motel Co. and thereafter by a subsequent transferee, Ceasar's. Bank loaned money to Ceasar's which was to be paid as rent and which would ultimately go to Kurylas. When Ceasar's defaulted on this obligation, Bank should be entitled to its collateral rather than now finding out that Kurylas is entitled to it under a prior unknown conditional sale or secret lien.

This type of situation is similar to those cases in which the secured creditor has attempted to condition his consent to disposition upon a requirement that the proceeds of the sale be remitted to him. As the innocent third party has no control over the dealings between the creditor and his original debtor, the courts have struck down such attempts to make the third party the insurer of the debt. *Aberdeen PCA, supra* at 834 (Henderson, J., dissenting and cases cited therein); *Vacura v. Haar's Equipment, Inc.,* 364 N.W.2d 387 (Minn.1985).[10]

■ In summary, only those conditional consents by a secured party to the disposition of his collateral which are recognized

---

**10.** Kurylas' authority is further diluted by the fact that those cases deal with fact situations where the disposition is not authorized in the security agreement but is rather to be determined from the alternative "or otherwise" portion of 57A-9-306(2). As has been noted, that type of a fact situation is not before us.

by the UCC are effective to preserve his interest in the property.[11]

### B. Did Bank Lose Its Security Interest by a Consent to Disposition?

■ During the time Ceasar's had possession of the collateral, Bank made various loans to it and secured such loans with Ceasar's inventory, accounts receivable and general intangibles, the liquor licenses. This security interest was perfected on December 13, 1984. In April of 1985 Kurylas regained possession of the motel complex. Kurylas filed a financing statement executed by Lewis as its debtor on April 15, 1985, as a condition of the leaseback from Kurylas to Lewis and Ceasar's. Kurylas now contends that the Lewis and Ceasar's transfer of the collateral back to Kurylas constitutes an authorized disposition extinguishing Bank's security interest pursuant to SDCL 57A-9-306(2). The trial court found that since Bank did not consent to such a transfer, its security interest continued in the collateral.

The security agreement between Bank and Ceasar's required Bank to give prior written consent to any disposition of collateral, except inventory, which could be sold to buyers in the ordinary course. It is undisputed that Bank did not execute a written consent authorizing such transfer to Kurylas. Kurylas argues that Bank's knowledge regarding the leaseback constitutes an authorization of the disposition under the "or otherwise" exception of SDCL 57A-9-306(2). We disagree.

This court addressed the same issue in *Aberdeen PCA, supra.* In that case we refused to find the written consent in documents other than the security agreement. In the present case, unlike *Aberdeen PCA,* no documents exist that purport to evidence a written consent to transfers by Bank. Yet this court, upon a full review of all the facts in *Aberdeen PCA,* found that there was no "otherwise" authorization for the sale of the cattle, and thus, the security interest continued. The same result arises from the facts of this case. Kurylas has shown that Bank knew there was some change in the relationship between Kurylas and Ceasar's, but he failed to establish that Bank knew there had been an actual transfer of the collateral. Absent knowledge of a transfer, there certainly can be no consent to the disposition by Bank. Further, in *Aberdeen PCA* this court held that even if there is knowledge, it will not be elevated to the legal status of an "authorization" to extinguish a security interest. 379 N.W.2d at 832. To hold to the contrary would also be inconsistent with the terms of the security agreement which required written consent. Therefore, Bank's security interest survived the unauthorized transfer to Kurylas. Similarly, the November 6, 1985, transfer of the liquor licenses from Ceasar's to Kurylas following repossession of the motel by Kurylas had no effect on Bank's security interest as Bank had also not consented to this transfer.

### C. Did Bank Have a Superior Right to Possession of the Collateral on November 6, 1985?

■ Bank had a perfected security interest in Ceasar's inventory, accounts receivable and licenses on December 13, 1984, as well as an unperfected interest in Ceasar's equipment in January of 1985.[12] Any security interest Kurylas had in the initial transactions with Kiser was extinguished by the disposition of July 1983 and, therefore, Kurylas did not perfect his security interest in the collateral until the April 15, 1985, transaction. However, this filing was ineffective as to equipment since Kurylas failed to describe the equipment as collateral in the financing statement.

---

**11.** This holding does not mean that a secured party under 57A-9-306(2) cannot protect himself in this type of a situation. The most obvious protection is to file a financing statement signed by the original purchaser, thus bringing into play the protection offered by 57A-9-402(7). As an alternative, the secured party can withhold his assent to the disposition unless the subsequent purchaser signs a financing statement establishing perfection in the collateral against that party. This is a type of conditional disposition which is clearly allowed by the UCC. *Mann Inv. Co. v. Columbia Nitrogen Corp.,* 173 Ga.App. 77, 325 S.E.2d 612 (1984); *In re Hodge Forest Industries, Inc., supra; In re Vieths, supra.*

**12.** Bank failed to file a financing statement in accordance with SDCL 57A-9-402 as to equipment.

Priority between conflicting perfected security interests is determined by time of filing or perfection. SDCL 57A–9–312(5). Thus, Bank achieved priority over Kurylas by being the first to file its financing statement. Bank's unperfected security interest in equipment of January 1985 has priority over the unperfected interest of Kurylas in the same collateral which did not arise until April 11, 1985. Therefore, any interest Kurylas obtained through the Lewis and Ceasar's transaction of April 1985 is subordinate to Bank's interest in the inventory, accounts receivable, liquor licenses and equipment.

On November 4, 1985, Ceasar's was in default to Bank by reason of nonpayment of three notes. Bank was entitled to immediate possession of the collateral pursuant to the terms of its security agreements and the provisions of SDCL 57A–9–503.[13] Notwithstanding the fact that Bank had the right to immediate possession of the collateral on November 6, 1985, Kurylas took possession of Bank's collateral. This action constituted conversion.

This court has recognized that a conversion action is an appropriate action where a party interferes with a secured party's right to take possession by reason of the debtor's default. *Sanborn County Bank v. Magness Livestock Exchange,* 410 N.W. 2d 565, 567 (S.D.1987). The UCC also addresses this situation in § 9–306, Official Comment 3:

> In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion.

Because Kurylas' security interest was subordinate to Bank's, the trial court was correct in holding that Kurylas converted property belonging to Bank.

Kurylas argues that upon receipt of a demand for delivery of personal property, the one holding the property of another has a reasonable time to investigate to determine who has the right to possession. *Rapid Sewing Center v. Sanders,* 79 S.D. 373, 112 N.W.2d 233 (1961). This contention is without merit, as Kurylas did much more than merely investigate ownership. Kurylas transferred liquor licenses to its own name, made beneficial use of the property and leased the property back to Ceasar's and Lewis. These actions illustrate that such property was converted, as defined by *Scherf v. Myers,* 258 N.W.2d 831, 834 (S.D.1977): "Conversion is the act of exercising control or dominion over personal property in a manner that repudiates the owner's right in the property or in a manner that is inconsistent with such right."

■ Because Kurylas took possession of the collateral securing Bank's loan, Bank was prevented from disposing of the collateral pursuant to SDCL 57A–9–503. This conversion entitles Bank to the value of the property at the time of conversion, plus interest. SDCL 21–3–3(1). The trial court assessed these damages as equal to the amount of Ceasar's unpaid obligations to Bank, with interest, since Bank is not entitled to any more than the loss from the disposition of its collateral. SDCL 57A–9–504(1) and (2). We hold that the damages assessed by the trial court were proper.[14]

### ISSUE III

### IS THE UNITED STATES ENTITLED TO PRIORITY OF ESCROW FUNDS BY VIRTUE OF 26 U.S.C. § 6321?

Section 6321 of the Internal Revenue

---

**13.** SDCL 57A–9–503 provides: "Unless otherwise agreed a secured party has on default the right to take possession of the collateral ..." *See also Farmers State Bank v. Otten,* 87 S.D. 161, 204 N.W.2d 178 (1973).

**14.** Kurylas also assigns as error the finding of the trial court that he failed to perfect his security interest of June of 1983 when he finally filed his financing statement signed by Kiser in November of 1984. At that time, the motel and its contents were in the possession of Ceasar's, not Kiser. As we have held that the underlying security interest did not survive the transfer from Kiser to Motel Co. in June of 1983, we need not address this additional issue.

Code of 1954 [15] imposes a federal tax lien upon "all property and rights to property, whether real or personal," belonging to a delinquent taxpayer. 26 U.S.C. § 6321 (1964). Such tax liens arise automatically at the time of assessment and continue until the underlying tax liability is satisfied or the statute of limitations expires. This lien attaches to all property or property rights the taxpayer then holds or subsequently acquires. *Glass City Bank v. United States*, 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945); *J.D. Court, Inc. v. United States*, 712 F.2d 258 (7th Cir.1983); *Bank of America Nat. Trust & Sav. Ass'n. v. Mamakos*, 509 F.2d 1217 (9th Cir.1975). The scope of section 6321 is "broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. National Bank of Commerce*, 472 U.S. 713, 719–20, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565, 573 (1985).

The priority of federal tax liens over other liens is essentially based upon "first in time is first in right." *United States v. City of New Britain*, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520, 526 (1954). This general lien of the government prevails against all unperfected or inchoate liens covering a taxpayer's property or rights to property with the exceptions outlined in 26 U.S.C. § 6323 (1964). That section provides that federal tax liens are invalid with respect to the claims of any "purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until proper notice has been filed." *J.D. Court, Inc., supra.*

Kurylas argues that its claim to the escrow proceeds is superior to that of the United States because (1) Ceasar's had no property interest in the escrow account for a government lien to attach—Kurylas was the rightful owner; (2) even if Ceasar's had an interest in the escrow funds, Kurylas was nonetheless a purchaser without notice of lien, entitled to first priority to the escrow funds under section 6323(a); and (3) Kurylas was a purchaser of "securities"

without notice, and, therefore, entitled to prevail under section 6323(b). We disagree.

■ Our initial determination concerns the question of ownership of the escrow funds. The parties stipulated that the monies deposited in the escrow accounts were drawn from Ceasar's checking account, and the source of such funds was through Bank loans made to Ceasar's. The escrow agreement is of primary importance in setting forth the parties' intent as to ownership of the funds:

### MANNER OF PAYMENT

Tenant agrees to deposit $22,500 on the 15th of June, July, August, September, October and November, 1985 and the escrow shall pay to Landlord $22,500 on December 1, 1985, and the 1st of January, February, March, April and May, 1986.

Tenant agrees to deposit $22,500 on the 15th of such months in 1986 to prepay the lease payments required for December, 1986 and January through May, 1987 ...

The interest accruing on such escrow account to be credited to the Tenant quarterly providing the Tenant is not in default under the terms of this Lease. In the event of default, the principal and interest accrued on such escrow account after the date of default shall be the sole property of the Landlord.

Kurylas argues that the law of prepaid rent is controlling in ascertaining the ownership of the escrow assets. Generally, prepaid rent is property of the landlord and such transfer of title occurs upon payment by the tenant to the landlord and is not contingent upon a later default. *Zaconick v. McKee*, 310 F.2d 12 (5th Cir.1962); *Maryland National Bank v. United States*, 227 F.Supp. 504 (D.Md.1964). Thus, under this rationale, Kurylas would have ownership of the first two payments of rent monies prior to the IRS assessment.

---

**15.** We note that a major change in the Internal Revenue Code occurred in 1986. All facts here-

in antedate this change, and, therefore, the Internal Revenue Code of 1954 is controlling.

.

This case, however, is not a direct transfer of funds from Ceasar's to Kurylas; it also brings into play an escrow account, and with it, the body of law that pertains to escrow. Escrow is defined as a writing, deed, money, stock or other property delivered by the grantor, promisor or obligor into the hands of a third person, to be held by the latter until the happening of a contingency or performance of a condition, and then by him delivered to the grantee, promisee or obligee. Black's Law Dictionary 489 (5th ed. 1979); *King v. First National Bank of Fairbanks*, 647 P.2d 596 (Alaska 1982); *Pike v. Triska*, 165 Neb. 104, 84 N.W.2d 311 (1957). Money may be the subject of an escrow agreement. *Edward Rose Sales Co. v. Shafer*, 41 Mich. App. 105, 199 N.W.2d 655 (1972). When property has been placed in escrow under an agreement that the property is to go to a particular person upon the meeting of a condition, title vests in that person when the condition is met. *Edward Rose, supra; Alexander v. Vandercook*, 136 Mich. 642, 99 N.W. 858 (1904); *Mar Win Development v. Wilson*, 104 N.W.2d 369 (N.D. 1960). The grantor or obligor of an instrument held in escrow loses control over it although he retains legal title and its concomitants until performance of the conditions of the escrow contract by the grantee or obligee. *Pike, supra; Mar Win, supra;* 30A C.J.S. Escrows § 9.

Such state law is important to this issue as it determines whether a party has "property or rights to property" to which a lien of the government can attach. *Aquilino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); *Avco Delta v. United States*, 484 F.2d 692 (7th Cir.1973). While South Dakota does not have much case law concerning escrow, the case of *Wyatt v. Meade County Bank*, 40 S.D. 111, 166 N.W. 423 (1918) is of great assistance in resolving this question.

> Payment of a part of the purchase price [to the escrow agent], however, does not vest a legal or equitable title in the purchaser, but only an equitable interest in the property. A so-called "equitable title" is nothing more than a right to legal title, which may be presently enforced in equity. The so-called "equitable title" or right does not become vested in the purchaser until full payment of the purchase price-or other fulfillment of the conditions of the contract-until which time *the purchaser has no interest which can by virtue of this contract become subject to a lien* as of a mortgage, although part payment may have given him an equitable interest in the property, which a court of equity will protect.

40 S.D. at 114, 166 N.W. at 424. (emphasis added)

This court in *Wyatt* made it clear that the potential recipient of the property under the escrow agreement did not have sufficient property interest prior to performance for a lien to attach. Therefore, the other party who still held legal and equitable title to the property must be subject to attachment on the entire value of the property. The potential recipient's right to equitable relief from a state court would be useless here because after the lien attached, the United States was entitled under section 6321 to its priority which Congress has not allowed to be defeated or diluted by subsequent state court equitable actions. "'Once it has been determined that state law creates sufficient interests in the [taxpayer] to satisfy the requirements of [the statute], state law is inoperative,' and the tax consequences thenceforth are dictated by federal law." *United States v. National Bank of Commerce*, 472 U.S. at 722, 105 S.Ct. at 2926, 86 L.Ed.2d at 575.

Ceasar's may have lost control over the funds it deposited in the escrow accounts, but it retained legal and equitable title under the law of escrow until the conditions of the escrow agreement were performed; i.e., the earliest of either the date of transfer, December 1, 1985, or default (which occurred October 15, 1985). Before the happening of either event, on August 19, 1985, the United States attached all funds in the escrow account as of that date. Therefore, any legal or equitable title that Kurylas may have been eligible to receive did not occur before October 15, 1985, and by that time, the funds had become encumbered by the IRS assessment.

As there had been no default on the date of assessment, the interest on the two payments made before that date also remained the property of Ceasar's and thus subject to the lien.

The second two payments were made subsequent to the date of assessment, on September 9 and October 7, 1985. These funds placed in the escrow account were encumbered at the time of deposit; therefore, Kurylas' claim must yield to the IRS statutory authority. The interest accruing on these encumbered funds would also be encumbered. *Phelps v. United States*, 421 U.S. 330, 95 S.Ct. 1728, 44 L.Ed.2d 201 (1975). The agreement provides that interest belongs to Kurylas upon default, but it cannot override the IRS assessment which had occurred prior thereto. We hold that all four payments made by Ceasar's into the escrow account and the accrued interest were the property of Ceasar's subject to the government's tax lien under section 6321.

■■■ Kurylas claims that it was a "purchaser" without notice under 26 U.S.C. § 6323(a) and, therefore, entitled to priority of the escrow funds under this exception to the general rule. Section 6323(h)(6) defines a purchaser as follows:

The term "purchaser" means a person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice. In applying the preceding sentence for purposes of subsection (a) of this section, and for purposes of section 6324—

(A) a lease of property,

(B) a written executory contract to purchase or lease property,

(C) an option to purchase or lease property or any interest therein, or

(D) an option to renew or extend a lease of property, which is not a lien or security interest shall be treated as an interest in property.

Kurylas claims that it was a purchaser of the prepaid rents in the escrow account in return for Ceasar's continued occupancy of the motel. We disagree. A purchaser within the meaning of the statute usually means one who acquires title for a valuable consideration in the manner of vendor and vendee. *United States v. Scovil*, 348 U.S. 218, 75 S.Ct. 244, 99 L.Ed. 271 (1955) (interpreting § 3672, predecessor of § 6323(h)(6)). The protection of a purchaser has been extended to a lessee, so that he cannot lose his leasehold or his option to renew or extend it on account of a federal tax lien not yet duly filed at the time he entered the lease or the executory contract or the option to lease. Plumb, Federal Tax Liens, Chap. 2, § 4 (3d ed. 1972). The statute has been broadened to include a lessee as a purchaser, but we will not extend the scope of that statute to include a lessor as a purchaser without further statutory guidance or supporting case law. To allow a landlord to become a purchaser when he receives rent for leased premises, either presently or in the future, is not within the scope of section 6323(h)(6). If such was the case, lessors could avoid the priority of all federal tax liens on a debtor's property by establishing accounts similar to those of Kurylas and Ceasar's. An interpretation of "purchaser" in such a broad manner would offend the purpose of section 6321, the "superpriority" statute.

■■■ Kurylas is also not a bona fide purchaser of "securities" under section 6323(b) so as to be afforded protection from the tax lien. Congress has limited the definition of a "security" to money or various documents described as negotiable instruments. *United States v. First Nat. Bank*, 458 F.2d 560 (6th Cir.1972). As none of the parties to this appeal maintain that the escrow agreement is a negotiable instrument,[16] the sole remaining question is whether it falls within the definition of "money." "[M]oney in the section means money; the kind one could bite, feel or

---

**16.** Negotiable instruments are defined by SDCL 57A-3-104 and sections following thereafter. *See Western Bank v. RaDec Const.*, 382 N.W.2d

406 (S.D.1986) for a discussion as to whether an instrument purported to be negotiable is conditional or unconditional.

pinch. If one should define it as 'money or the right to receive money,' the door would be open beyond any reasonable width that the Congress could have had in mind." *Worley v. United States,* 340 F.2d 500, 502 (9th Cir.1965). On the date of assessment, Kurylas had at most the right to receive money from the escrow account on a future date, and the right to receive money is not included in the definition of a security. *First Nat. Bank, supra; Worley, supra.* It is clear that the escrow account does not constitute a security as it is not "money." Therefore, Kurylas is not entitled to the exception from the effects of the tax lien on the grounds that it was a purchaser of securities under section 6323(b).[17]

The decision of the trial court is affirmed.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

SABERS, J., dissents.

GILBERTSON, Circuit Judge, sitting for HENDERSON, J., disqualified.

SABERS, Justice (dissenting).

I dissent on Issue III because the United States is not entitled to priority of escrow funds by virtue of 26 U.S.C. § 6321. The core of the IRS' argument is that the prepaid rents held in escrow were at all times the property of Ceasar's, Inc., and thus subject to the IRS lien. As pointed out in Kurylas' brief, the IRS failed to cite three paragraphs from the escrow agreement which make clear that the payments into the escrow account were prepaid lease payments. Ceasar's had no right to those payments; they were paid to the escrow account for Kurylas and belonged to Kurylas under the expressed terms of the escrow agreement, and contrary to the IRS' assertions, no contingency needed to occur for those payments to become Kurylas' property. In fact, the only contingency was that Ceasar's would be entitled to the use of the

premises six months later if they avoided default.

The majority opinion states at page 659–60:

Section 6321 of the Internal Revenue Code of 1954 imposes a federal tax lien upon "all property and rights to property, whether real or personal," belonging to a delinquent taxpayer. 26 U.S.C. § 6321 (1964). Such tax liens arise automatically at the time of assessment and continue until the underlying tax liability is satisfied or the statute of limitations expires. This lien attaches to all property or property rights the taxpayer then holds or subsequently acquires. *Glass City Bank v. United States,* 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945); *J.D. Court, Inc. v. United States,* 712 F.2d 258 (7th Cir.1983); *Bank of America Nat. Trust & Sav. Ass'n. v. Mamakos,* 509 F.2d 1217 (9th Cir.1975). The scope of Section 6321 is "broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. National Bank of Commerce,* 472 U.S. 713, 719–20, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565, 573 (1985).

The dispute is in the application of the law, not in the law itself. The point the majority opinion obviously overlooks is that the federal tax lien only reaches the interest in property that a taxpayer has, and not the interest in property of the taxpayer's creditor. These prepaid lease payments belonged to Kurylas under the escrow agreement and neither Ceasar's nor its successor, the IRS, had any interest therein except for the accrued interest. This position is indirectly conceded by the majority opinion on page 662 where it states:

The second two payments were made subsequent to the date of assessment, on September 9 and October 7, 1985. These funds placed in the escrow account were encumbered at the time of deposit; therefore, Kurylas' claim must yield to the IRS statutory authority. The interest accruing on these encumbered funds

---

17. The trial court also found in favor of the United States and against Kurylas under 31 U.S.C. § 3713 as an additional basis for its holding. Since we affirm the trial court's award of the funds to the United States on the basis of 26 U.S.C. § 6321, we deem it unnecessary to review this alternative holding.

**664**

would [also be encumbered]. *Phelps v. United States*, 421 U.S. 330, 95 S.Ct. 1728, 44 L.Ed.2d 201 (1975).

The majority opinion is correct as to interest and payments after the date of assessment, but not correct as to payments before the date of assessment. The federal tax lien assessment occurred on August 19, 1985 and the federal tax lien did not attach to any funds paid into the escrow account prior to that date. Therefore, the first two prepaid lease payments of $22,500 each which were made on July 1, 1985 and July 21, 1985, were the property of Kurylas and not the property of Ceasar's and therefore not attachable by the IRS. The IRS' federal tax lien could only attach to property of Ceasar's, which at that point was nothing more than the right to use the property for periods of one month each in December 1985 and January 1986 and accrued interest.

This escrow account operates under South Dakota law the same as a pledge and does not need to be filed to be effective as long as the two prepaid lease payments were paid prior to the IRS' assessment date of August 19, 1985. As indicated above, the IRS lien only attaches to the rights of the debtor (taxpayer) and not the rights or money of the debtor's creditor.

As indicated in the majority opinion at page 660, the priority of federal tax liens over other liens is essentially based upon

"[F]irst in time is the first in right." *United States v. City of New Britain*, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520, 526 (1954). This general lien of the government prevails against all unperfected or inchoate liens covering a taxpayer's property or rights to property with the exceptions outlined in 26 U.S.C. § 6323 (1964). That section provides that federal tax liens are invalid with respect to the claims of any "purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until proper notice has been filed." *J.D. Court, Inc., supra.*

This federal tax lien was invalid with respect to the claims to Kurylas' property

which was properly placed in an escrow account prior to and outside the reach of Ceasar's or its creditor, the IRS.